STATE OF NORTH CAROLINA v. HERMAN LESLIE DAVIS

No. 844SC451

(Filed 16 April 1985)

**Homicide § 21.7— second-degree murder—insufficient evidence**

   The State's evidence was insufficient to support defendant's conviction of second-degree murder where it tended to show only that defendant was drunk and a nuisance toward others on the weekend when the victim's death occurred; defendant was in the general vicinity of the victim's home at a time when the murder could have been committed; the victim's housekeys were found at or near the place on a public sidewalk where defendant had been sleeping some eight and one-half hours earlier; and a feather found on defendant's trousers five days after the murder and feathers found on a pillowcase in the victim's bedroom all originated from a white chicken.

APPEAL by defendant from *Llewellyn, Judge.* Judgment entered 1 December 1983 in Superior Court, DUPLIN County. Heard in the Court of Appeals 18 January 1985.

Defendant Herman Davis was charged with the first degree murder of Lillian Groves on 18 June 1983. At the close of the State's evidence, defendant moved for dismissal of the charges pursuant to G.S. 15A-1227(a). His motion was denied. Defendant presented no evidence and renewed the motion to dismiss, which was again denied. The jury convicted him of second degree murder and judgment was entered imposing a prison sentence of thirty-five years. Defendant appeals.

*Attorney General Rufus L. Edmisten, by Assistant Attorney General Walter M. Smith, for the State.*

*Appellate Defender Adam Stein, by Assistant Appellate Defenders Geoffrey C. Mangum and Lorinzo L. Joyner, for defendant appellant.*

MARTIN, Judge.

The determinative issue on this appeal is whether the trial court erred in overruling defendant's motion for dismissal pursuant to G.S. 15A-1227(a). We conclude that because the State failed to meet its burden to present substantial evidence that defendant committed the murder of Lillian Groves, the motion should have been allowed.

Evidence for the State tended to show the following facts and circumstances. Lillian Groves, who was 65 years old, lived alone on North Pine Street in Rose Hill. On Saturday, 18 June 1983, she visited with several of her neighbors and was observed by others as she sat in her yard. She was known to lock her house even while out in her own yard, and to carry her keys on a safety pin fastened to her clothing. At least two of her neighbors observed her carrying her keys in this fashion on 18 June. She was last seen alive at approximately 9:30 p.m. on that same night, sitting in a rocking chair in the living room. None of her neighbors noticed any strangers in the neighborhood that night nor did they hear any unusual noises. Mrs. Groves was not seen by her neighbors on Sunday, 19 June, nor did they notice any lights on in her house Sunday night or Monday morning. On the afternoon of Monday, 20 June, Mrs. Hildred Dixon, Ralph Henderson and Mrs. Gerri Futrell went to her house to check on her and found the front door unlocked. Upon entering, they found Mrs. Groves' semi-nude body lying partially on and partially off the bed. The house was in disarray. Dr. Corbett Quinn, the Duplin County medical examiner, testified that Mrs. Groves had contusions, bruises and abrasions on her head, face, upper chest and legs, and that it appeared as though she had been beaten. He also testified that he could not determine the approximate time of her death, although when asked if death could have occurred between 9:30 and 10:00 p.m. on Saturday, 18 June, he said, "I think it could have, but I have no way of saying that it did happen during that time." An autopsy was conducted by Dr. Walter Gable, who found that Mrs. Groves had suffered fractured ribs and a brain hemorrhage due to a beating and that the cause of her death was strangulation and head injuries.

The State also offered evidence that defendant had come, by bus, to Rose Hill from Jacksonville, where he lived with his brother and worked as a carpenter, on Saturday, 18 June. Upon arrival, he walked to Elaine Siders' house to pay her for preparing his income tax return, but she was not at home. He visited with some people and then went to Duplin Wineries, purchased a fifth of wine and drank it. Later that afternoon he went into a grocery store and stared at a female cashier before being asked to leave by the manager. He also went to the barbershop where he was loud, profane and appeared to be drunk. At about 5:30

p.m. he walked to William Futrell's apartment at the Duplin Apartments, a short distance from Mrs. Groves' house. He was observed talking to Mrs. Groves as he walked by her house, he was waving his arms in the air and Mrs. Groves, who had been sitting in her yard, got up and went into her house. Defendant walked on. When he arrived at William Futrell's apartment, he borrowed Futrell's bicycle, telling him that he would return it in two hours. At approximately 9:30 p.m. defendant had not returned the bicycle so Futrell and his wife went looking for defendant in their automobile. As they passed Mrs. Groves' house, Mrs. Futrell observed her sitting inside the house with the lights on and the front door open. The Futrells rode through Rose Hill looking for defendant but were unable to locate him. As they were returning to their apartment, they observed defendant riding the bicycle in a direction away from Pine Street. He was about 500 yards from Mrs. Groves' house. The Futrells stopped to talk with defendant and to ask him to return the bicycle. He appeared drunk and, before talking to them, he went behind the car and appeared to "tuck down at his pants." Otherwise, they noticed nothing peculiar about his behavior or appearance. Defendant said he would return the bicycle, but instead he rode off in the other direction and into a trailer park. As the Futrells returned home, Mrs. Futrell observed that Mrs. Groves' house was dark and the door was closed.

The next morning, William Futrell again went looking for the defendant. He saw defendant coming out of the woods near Charlie Newkirk's house, about a half-mile from Futrell's apartment. Defendant told Futrell that he had gotten drunk and couldn't remember where he had left the bicycle. Futrell later found the bicycle at the trailer park where he had seen the defendant the previous night.

On Sunday morning, about 10:00 a.m., Officer Scott of the Rose Hill Police Department found defendant drunk and asleep, lying partially on the sidewalk and partially on the grass in front of Wendell Murphy's office on Church Street. Officer Scott put defendant in his patrol car and drove him to a trailer park. Shortly thereafter, Officer Scott saw defendant again near a gas station on Highway 117. Defendant was yelling at some women and trying to reach into their car. About 3:00 p.m. Officer Scott found defendant lying on the sidewalk of Church Street across from the post office. At that time, Officer Scott took defendant to the Duplin County jail at Kenansville. He noticed that defendant had

bruises on his neck and inquired as to how he had gotten the bruises. Defendant stated that he could not remember how he had gotten the bruises or where he had spent the night. The jailer let defendant out of jail about 8:45 p.m., gave him money for a bus ticket, and took him to Warsaw. The jailer, Robert Bostic, testified that defendant kept saying that he had to go to Jacksonville and that he had tears in his eyes. Although defendant had frequently been seen in Rose Hill before 18 June 1983, he was not seen around town thereafter.

On Sunday, 19 June, at about 6:30 p.m., Bennie Howard and her three young daughters were walking on Church Street when her daughters found three keys on a safety pin on the cement in front of Wendell Murphy's office. A fourth key was found in the grass beside the cement. The keys were found in the same area where Officer Scott had found defendant sleeping on Sunday morning. Mrs. Howard turned the keys over to the police. It was later determined that two of the keys fit a padlock found in Mrs. Groves' pocketbook and the other two keys fit the door lock of her house.

Chief Maready of the Rose Hill Police Department interviewed defendant in Jacksonville on 23 June 1983. Chief Maready gave defendant no indication of the reason for the interview; defendant gave no indication that he was aware that Mrs. Groves had been killed. Defendant told Chief Maready that he had gotten drunk on Saturday night in Rose Hill and did not remember where he had been. He denied having been to Mrs. Groves' house or having had her keys. Defendant voluntarily gave Chief Maready the clothes that he had been wearing that weekend and told him that the clothes had been washed. No blood was found on the clothes, but a white feather was found in the area of the front pocket of defendant's jeans.

Mrs. Groves' clothing and other items from her bedroom, including a bedsheet and pillow cases, were submitted to the SBI laboratory for analysis. No fiber or hair transfers were found between any of these items and defendant's clothing; some white feathers were found on one of the pillowcases. Mrs. Groves' house was processed for latent fingerprints but none were found that were sufficient for analysis. Vaginal swabs from Mrs. Groves' body did not reveal the presence of semen. Special Agent Deed-

rick of the Federal Bureau of Investigation laboratory conducted a microscopic comparison of the feathers found on the pillowcase with the feather found on defendant's jeans. In his opinion, the feathers appeared to have "originated from the same type of bird, which was a chicken."

Upon a defendant's motion for dismissal, pursuant to G.S. 15A-1227, it is a question of law for the Court to determine whether the State has produced substantial evidence of each of the material elements of the offense charged, or any lesser offense, and substantial evidence that the defendant was the perpetrator of the crime. *State v. LeDuc*, 306 N.C. 62, 291 S.E. 2d 607 (1982); *State v. Cutler*, 271 N.C. 379, 156 S.E. 2d 679 (1967). In ruling upon the motion

> [t]he evidence is to be considered in the light most favorable to the State; the State is entitled to every reasonable intendment and every reasonable inference to be drawn therefrom; contradictions and discrepancies are for the jury to resolve and do not warrant dismissal; and all of the evidence actually admitted, whether competent or incompetent, which is favorable to the State is to be considered by the court in ruling on the motion. [Citations omitted.]

*State v. Powell*, 299 N.C. 95, 99, 261 S.E. 2d 114, 117 (1980).

The test of the sufficiency of the evidence to sustain a conviction is the same whether the evidence is direct, circumstantial, or both. *Id.*

> When the motion . . . calls into question the sufficiency of circumstantial evidence, the question for the Court is whether a reasonable inference of defendant's guilt may be drawn from the circumstances. If so, it is for the jury to decide whether the facts, taken singly or in combination, satisfy them beyond a reasonable doubt that the defendant is actually guilty. [Citations omitted.]

*Id.* at 99, 261 S.E. 2d at 117, *quoting, State v. Rowland*, 263 N.C. 353, 358, 139 S.E. 2d 661, 665 (1965). However, "[i]nference may not be based on inference. Every inference must stand upon some clear and direct evidence, and not upon some other inference . . . ." *State v. Parker*, 268 N.C. 258, 262, 150 S.E. 2d 428, 431 (1966). If the evidence, when considered in the light of the forego-

ing principles, is sufficient only to raise a suspicion, even though the suspicion may be strong, as to either the commission of the crime or that the defendant on trial committed it, the motion for dismissal must be allowed. *In re Vinson*, 298 N.C. 640, 260 S.E. 2d 591 (1979).

Of course, the application of these well-established principles by the trial court to the unique facts and circumstances proven in each case is often a considerably more difficult task than their authoritative declaration in an appellate opinion. When is circumstantial evidence sufficiently substantial to provide a reasonable inference of a defendant's guilt, or only sufficient to raise a suspicion? It is not possible to answer the question with a precise rule of application, or test of "substantial evidence," due to the variant fact situations presented to the judge in each case. Nevertheless, while the standard requires that each case must stand or fall on the strength of its particular circumstances and the inferences reasonably drawn therefrom, a comparison with precedent will many times offer guidance, and provide some measure of consistency, in application.

With that thought in mind, we have examined several cases decided by our Supreme Court upon similar, and arguably somewhat stronger, circumstantial evidence than the evidence before us in the present case. In *State v. Cutler, supra*, the deceased was stabbed to death. The defendant was seen driving his truck to the home of the deceased on the day of the murder, and was later observed in a drunken condition and "bloody as a hog." He had a gash on his head. His knife blade also had human blood on it and a hair stuck on the blade was similar to the chest hair of the deceased. The defendant said that the deceased had killed himself. The Supreme Court held that the evidence was insufficient to go to the jury.

In *State v. Scott*, 296 N.C. 519, 251 S.E. 2d 414 (1979), the deceased was found in his home, shot to death from close range, and the house had been ransacked. The defendant's thumbprint was found on a metal box on the deceased's desk. The niece of the deceased, who had lived with her uncle all of her life, testified that she had never seen the defendant and, to her knowledge, he had never visited the home. Chief Justice Sharp, speaking for the court in *Scott*, held that the evidence, though sufficient to raise a

strong suspicion as to Scott's guilt, was insufficient to defeat a
motion to dismiss.

In *State v. White*, 293 N.C. 91, 235 S.E. 2d 55 (1977), the
deceased was stabbed to death in her mobile home unit located at
a motel. A black man wearing a light shirt and dark trousers was
seen running from the mobile home in the direction of the room
where the defendant was staying. Shortly thereafter, police of-
ficers saw the defendant, who was black and was dressed in a
white shirt and dark trousers, standing outside his room. Blood of
the same type as that of the deceased was found on defendant's
shoes, there was blood on the carpet of his room, and specks of
blood were on his T-shirt. A knife of the same type as the murder
weapon was found under the television in his room. This evidence
was deemed insufficient to "remove the case from the realm of
surmise and conjecture." For other examples where circumstan-
tial evidence has been found insufficient to overcome a motion for
dismissal, see *State v. Lee*, 294 N.C. 299, 240 S.E. 2d 449 (1978)
(where victim and defendant had been living together, within two
weeks of the murder defendant had beaten victim after she ad-
mitted to having an affair, a day before the murder defendant
said he was going to kill her); *State v. Jones*, 280 N.C. 60, 184 S.E.
2d 862 (1971) (where victim and defendant were married; victim,
who had been shot six times at close range with a .22 caliber
weapon, was found in the storage room of family store where
defendant had been working on the night of the murder; when ar-
rested the same night, defendant was drunk and had five empty
.22 caliber shell casings and three live rounds in his pocket); *State
v. Gragg*, 122 N.C. 1082, 30 S.E. 306 (1898) (where victims were
killed by dynamite, defendant had possessed dynamite, the rela-
tionship between defendant and victims was strained and de-
fendant had made threats against one of them, shoe print of the
same size shoe as worn by defendant was found a few hundred
yards from the place of the homicide); *State v. Bell*, 65 N.C. App.
234, 309 S.E. 2d 464 (1983), *aff'd per curiam*, 311 N.C. 299, 316 S.E.
2d 72 (1984) (where victim's keys were found in defendant's
pocket, a knife found near where defendant was apprehended fit a
sheath found in victim's apartment and bloodstains found in vic-
tim's apartment were consistent with defendant's blood type).

Turning now to an analysis of the State's evidence in the
case before us, we examine the circumstances proven to deter-

mine whether they give rise to a reasonable inference, so as to amount to substantial evidence, that defendant committed the murder of Lillian Groves. The State concedes that the question of the sufficiency of the evidence is a close one, but urges that the circumstances in combination were substantial. We disagree. The fact that Mrs. Groves' house keys were found at or near the spot on a public sidewalk where defendant had been sleeping some eight and a half hours earlier is so entirely speculative of guilt that it is of little, if any, probative value. First, the inference must be drawn from the established facts that the defendant was the person who dropped the keys there. From that tenuous inference, additional inferences must be drawn that defendant obtained the keys from Mrs. Groves' house and that, in doing so, he killed her. Such a building of inferences is not permitted. *State v. Parker, supra.*

Evidence that a feather found on defendant's trousers five days after the murder and feathers found on a pillowcase in the victim's bedroom had as their common source the same species of bird, i.e., a white chicken, is likewise of such insignificant probative value as to the identity of the defendant as the perpetrator that it cannot be reasonably said to be substantial evidence. Finally, the evidence that defendant, who had been walking and riding a bicycle about town while drunk, profane and antagonistic, had bruises on his neck gives rise only to a reasonable inference that he had provoked an altercation with someone during the weekend. Such evidence is far too tenuous to be considered as substantial evidence that he committed a murder.

In sum, the evidence, taken in the light most favorable to the State, shows only that defendant was contemptibly drunk and a general nuisance on the weekend when Mrs. Groves' death occurred, and that he was in the general vicinity of her home at a time when the murder could have been committed. While this evidence may raise a suspicion that defendant may have been the killer, it was insufficiently substantial to take the issue of his guilt "beyond the realm of surmise and conjecture." *State v. White, supra.* Defendant's motion to dismiss should have been allowed.

Defendant has brought forward numerous other assignments of error relating to the trial which we need not address in the

light of our holding that the evidence was insufficient to sustain the defendant's conviction.

Reversed.

Judges BECTON and JOHNSON concur.