STATE OF NORTH CAROLINA v. THOMAS HENRY MYERS AND
JESSE WARREN COLEMAN, DEFENDANTS

No. COA04-567-2

(Filed 2 January 2007)

**Homicide— second-degree murder—motion to dismiss—sufficiency of evidence**

The trial court did not err in a second-degree murder case by granting defendants' motions to dismiss, because: (1) while the State's evidence raises a strong suspicion of defendants' guilt, it does not permit a reasonable inference that defendants were responsible for the death of the victim; (2) the evidence established at most that defendants had the opportunity to commit the crime; (3) none of the State's witnesses identified the victim as the man involved in the struggle with defendants, or as the man a witness saw in the road near the pertinent residence; and (4) there was testimony indicating there were other unidentified males in the area around the same time the murder allegedly occurred.

On remand by order of the Supreme Court of North Carolina filed 17 November 2006 to reconsider the unanimous decision of the Court of Appeals, *State v. Myers and Coleman*, 174 N.C. App. 526, 621 S.E.2d 329 (2005) for reconsideration on the issue of sufficiency of the evidence in light of *State v. Childress*, 321 N.C. 226, 362 S.E.2d 263 (1987). Appeal by the State from Order entered 20 November 2003 by Judge Robert F. Floyd, Jr., in Cumberland County Superior Court. Originally heard in the Court of Appeals 1 February 2005.

*Attorney General Roy Cooper, by Assistant Attorney General William B. Crumpler, for the State.*

*Daniel Shatz, for defendant-appellee Myers.*

*Brian Michael Aus, for defendant-appellee Coleman.*

HUDSON, Judge.

Defendants were tried for second-degree murder on 10 November 2003. At the close of the State's evidence and again at the close of all the evidence, defendants moved to dismiss, which motions the court denied. On 20 November 2003, the jury returned a verdict of guilty against both defendants. Before entry of judgment, defendants again

STATE v. MYERS

[181 N.C. App. 310 (2007)]

moved to dismiss and the court granted their motion. The State appealed to this Court, and in an opinion issued 15 November 2005, we affirmed the trial court's dismissal. *State v. Myers and Coleman*, 174 N.C. App. 526, 621 S.E.2d 329 (2005). The State appealed to the North Carolina Supreme Court, and on 17 November 2006, that Court remanded the case to us for reconsideration in light of *State v. Childress*, 321 N.C. 226, 362 S.E.2d 263 (1987). We affirm the trial court's dismissal.

Defendants were tried for the murder of Tommy Lee Barrow. The State introduced evidence that Mary Ann Essell was delivering newspapers around 3:00 a.m. on 10 July 2001 when she noticed a black male lying in the middle of Hopedale Road near the residence of May and Damon Herring. The man was propped up on one elbow and held up his hand. Ms. Essell thought the man was drunk and homeless. The man was wearing long dark pants, a dark shirt, and an Army jacket. She did not see any blood. After looking around for police assistance, Ms. Essell left the scene to get help. She returned to the area fifteen to twenty minutes later, accompanied by her son, to look for the man, but he was gone. Ms. Essell and her son looked in the Herrings' yard and the surrounding area, but could not find him. Ms. Essell never identified Barrow as the man she saw in the road. She also testified that she saw an unidentified man in a white t-shirt riding a bicycle in the area.

Evidence also showed that during the early morning of 10 July 2001, the Herrings heard a noise outside of their home that sounded like someone or something had hit their aluminum carport. Mr. Herring turned on the outside light and saw nothing. Around 6:00 a.m., he went out to get the newspaper and noticed nothing unusual. However, later in the morning when he went outside to do yard work, he saw a black male, later identified as Tommy Lee Barrow, lying on the ground near his carport. The man had on muddy socks, boxer shorts, and a white t-shirt covered in blood on the back. His sneakers and jean shorts were on the ground nearby, as was a wallet, some scattered change, keys, a crack pipe, and a bag. No jacket was found at the scene. Mrs. Herring called the police. A deputy from the Cumberland County Sheriff's Department arrived and found no vital signs.

An autopsy of Barrow's body revealed a stab wound in the right back, from a blow which struck his right lung and damaged the liver. Barrow died as a result of both internal and external bleeding. The stab wound would not have caused instantaneous death; Barrow

could have moved some distance for an unspecified period of time after being stabbed. North Carolina's Chief Medical Examiner, Dr. John Butts, opined that the injury was caused by a knife or knife-like object. The autopsy also revealed a cut on the left side of Barrow's face, as well as some blunt force injuries with scraped skin adjacent to the nose.

The State's primary witness, Lisa Beeler, testified that on the afternoon of 9 July 2001, and the night of 10 July 2001, she was at the Lady Slipper trailer park, where she bought crack from defendant Coleman and got high with defendant Myers. She testified that Myers cut the crack into smaller pieces with a big knife that had brass knuckles. According to Beeler, Barrow visited the trailer where Beeler was using crack several times that evening and left about 1:00 a.m. after speaking with defendant Coleman. She testified that she left the trailer park with both defendants around 3:00 or 4:00 a.m. to get more drugs. She stated that defendant Coleman told her that they were going to meet a man nearby and pick up more crack and that in the vicinity of Hopedale Road, Coleman told Myers, "There he is. There he is. Go over there and get the stuff, go talk to him." Ms. Beeler testified that she looked and saw a black man walking up the street, but she did not identify this man as Barrow, as she said she could not see him well enough to tell who it was. She and Coleman waited by a bush near the corner where the Herrings live. Beeler testified that she heard loud arguing coming from the direction where Myers and the other man were located and that Coleman turned her around and told her not to look that way, saying "You don't want to see this." According to Beeler, while they were still waiting, a light came on in the Herrings' house and Coleman said he was going to go see what was taking so long. Beeler testified that after a minute or so, she heard a loud groan coming from a struggle and then silence. She began to leave when defendants ran up to her about five minutes later. When she asked what was going on, Coleman told her to shut up and be patient.

Beeler testified that when she and defendants reached an intersection with a street light, Beeler saw that Myers had dirt and what appeared to be blood on him. Coleman told Myers he better remove the bloody clothes, to go home and shower. According to Beeler, Myers told Coleman, "I got him good, didn't I cuz?", to which Coleman responded that Myers should shut his mouth and be quiet, that he needed to think. Beeler stated that as they walked, Myers was going through something that appeared to be like a wallet and that one of

the defendants commented that there was no money in the wallet. When Beeler again asked what was going on, she said that Coleman told her, "Don't you want to get high? Just keep your mouth shut, or you're in like Tommy." However, Beeler testified that she believed that Coleman was referring to Tommy Myers and how dirty he was from the struggle. Coleman and Beeler returned to a friend's trailer, and when Myers got there about twenty minutes later, he had showered and changed into clean clothes. Beeler had made prior inconsistent statements to the police, but when questioned about this at trial, she stated that after she learned of the victim's death and realized what had happened, that she came forward.

Our review of a trial court's ruling on a motion to dismiss is the same regardless of whether the motion is made at the close of the State's evidence, at the close of all the evidence, after return of a verdict of guilty and before entry of judgment, or after discharge of the jury without a verdict and before the end of the session. *State v. Scott*, 356 N.C. 591, 595-96, 573 S.E.2d 866, 868 (2002). In reviewing the trial court's ruling, we must evaluate the evidence in the light most favorable to the State. *State v. Molloy*, 309 N.C. 176, 179, 305 S.E.2d 718, 720 (1983). All contradictions must be resolved in favor of the State. *Id.* The ultimate question is "whether a reasonable inference of the defendant's guilt may be drawn from the circumstances." *State v. Lee*, 348 N.C. 474, 488, 501 S.E.2d 334, 343 (1998). As long as the evidence supports a reasonable inference of defendant's guilt, it is up to the jury to decide whether there is proof beyond a reasonable doubt. *State v. Trull*, 349 N.C. 428, 447, 509 S.E.2d 178, 191 (1998). This is true regardless of whether the evidence is direct or circumstantial. *Id.* However, if the evidence is "sufficient only to raise a suspicion or conjecture as to either the commission of the offense or the identity of the defendant as the perpetrator, the motion to dismiss must be allowed." *Molloy*, 309 N.C. at 179, 305 S.E.2d at 720 (internal citation omitted). "This is true even though the suspicion aroused by the evidence is strong." *Id.* (internal citation omitted).

As noted by other courts faced with this issue, the rules regarding a determination of sufficiency of the evidence are easier to state than to apply and require a case-by-case analysis. *See, e.g., State v. Bell*, 65 N.C. App. 234, 236, 309 S.E.2d 464, 466 (1983), *aff'd*, 311 N.C. 299, S.E.2d 72 (1984); *State v. Cutler*, 271 N.C. 379, 383, 156 S.E.2d 679, 682 (1967). In our opinion issued on 15 November 2005, affirming the trial court's dismissal of this case, we cited several cases for the proposition that a conviction cannot be sustained if it impermissibly stacks

inferences. 174 N.C. App. at 530-31, 621 S.E.2d at 332-33 (citing *Bell*, 65 N.C. App. at 236, 309 S.E.2d at 466; *State v. Chapman*, 293 N.C. 585, 586, 238 S.E.2d 784, 785 (1977); *State v. Davis*, 74 N.C. App. 208, 213, 328 S.E.2d 11, 15, *disc. review denied*, 313 N.C. 510, 329 S.E.2d 406 (1985)). However, our Supreme Court has directed our attention to *State v. Childress*, which held that a jury could properly base "inferences on inferences," and that "[i]nsofar as *Holland*, *Byrd*, *LeDuc* and other cases hold that in considering circumstantial evidence an inference may not be made from an inference, they are overruled." *Id.*, 321 N.C. at 233, 362 S.E.2d at 267. Without addressing whether *Chapman*, *Davis*, and *Bell*, were overruled by *Childress* or are distinguishable, we conclude, as we did before, that while the State's evidence raises a strong suspicion of defendants' guilt, it does not permit a reasonable inference that defendants were responsible for the death of the victim.

Although our analysis of sufficiency of the evidence must be based on the "evidence introduced in each case, as a whole, and adjudications in prior cases are rarely controlling as the evidence differs from case to case," *Cutler*, 271 N.C. at 383, 156 S.E.2d at 682, our conclusion is guided, in part, by instructive cases. In *State v. Cutler*, the State offered evidence that on the same day as the murder, a truck similar to defendant's was seen at the victim's house and defendant was seen drunk and "bloody as a hog" with a large gash on his head about 500 yards from the victim's house. 271 N.C. at 381, 156 S.E.2d at 681. Defendant was also found in possession of a knife with both human blood and a hair "similar" to the chest hair of the victim on it. *Id.* at 384, 156 S.E.2d at 682. Nevertheless, the Court held that the evidence was insufficient, noting that the State's evidence did not show any blood from the deceased on "the person, clothing, knife or vehicle" of the defendant and that the testimony regarding the chest hair was inconclusive. *Id.* at 384, 156 S.E.2d at 682.

> [The evidence was] sufficient to raise a strong suspicion of the defendant's guilt but not sufficient to remove that issue from the realm of suspicion and conjecture. It may reasonably be inferred that the defendant was at the home of the deceased when the deceased came to his death, or shortly thereafter. However, it is not enough to defeat the motion for nonsuit that the evidence establishes that the defendant had an opportunity to commit the crime charged.

*Id.*

Similarly, in *State v. White*, the Court held that there was insufficient evidence to support that defendant was the perpetrator of second-degree murder. 293 N.C. 91, 235 S.E.2d 55 (1977). In *White*, the victim lived in a mobile home adjacent to the motel where defendant lived, defendant frequently visited the victim, defendant was a black male and a black male was seen running away from the mobile home on the evening of the killing, there was blood on the carpet of defendant's motel room, and a knife similar to the murder weapon was found in defendant's room. In holding that the trial judge should have allowed defendant's motion for non-suit, the Court stated that:

> [t]he State has shown that the defendant was in the general vicinity of the deceased's home at the time of the murder and that he made several arguably contradictory statements during the course of the police investigation. It may even reasonably be inferred that the defendant was at the home of the deceased when the deceased came to her death, or shortly thereafter. Thus, the State has established that the defendant had an opportunity to commit the crime charged. Beyond that we must sail in a sea of conjecture and surmise. This we are not permitted to do.

*Id.* at 96, 235 S.E.2d at 59 (internal citations and quotation marks omitted).

We conclude that as in *Cutler* and *White*, the evidence here establishes at most that defendants had the opportunity to commit the crime. Taking the testimony in the light most favorable to the State, the evidence tends to establish that: defendants were in the vicinity of the Herring residence sometime in the early morning of 10 July 2001, that Barrow's body was found in this vicinity several hours later, that defendants argued and struggled with an unidentified individual who groaned at one point during the struggle, and that defendant Myers appeared to have blood and dirt on his shirt after the struggle. We note that none of the State's witnesses identified Barrow as the man involved in the struggle with defendants, or as the man Mary Ann Essell saw in the road near the Herring residence. Furthermore, there was testimony indicating that there were other unidentified males in the area around the same time the murder is alleged to have occurred. Although the evidence here arouses strong suspicion, we conclude that it is "sufficient only to raise a suspicion or conjecture as to either the commission of the offense or the identity of the defendant as the perpetrator," and thus the trial court correctly granted defendants' motions to dismiss. *Molloy*, 309 N.C. at 179, 305 S.E.2d at 720.

Affirmed.

Judges WYNN and STEELMAN concur.

The judges participated and submitted this opinion for filing prior to 1 January 2007.