STATE OF NORTH CAROLINA v. ELBANKS WHITE

No. 118

(Filed 13 June 1977)

**Homicide § 21.4— murder by stabbing—insufficiency of evidence**

Evidence in a murder prosecution was insufficient to be submitted to the jury, though it established that defendant had an opportunity to commit the crime charged, since it was deficient in the following respects: (1) the desk clerk at the motel where deceased lived could not identify the man he saw leaving deceased's mobile home probably because of the distance and the darkness; (2) black men other than defendant were staying at the motel at the time of the offense in question; (3) no evidence was presented that defendant owned the murder weapon; (4) no fingerprints were found on the knife which was found in deceased's body; (5) no evidence was introduced of any blood found on defendant's pants; (6) about 15% of the population has the type of blood found on defendant's left shoe; (7) the type of blood found on the right shoe is found in 30% of the population; (8) the blood specks on the defendant's tee shirt and the blood found on his carpet were not identified by type or otherwise; (9) no motive was established for the crime; (10) no flight was attempted by defendant.

DEFENDANT appeals pursuant to G.S. 7A-27 (a) from judgment of *Seay, J.*, 15 November 1976 Criminal Session, WILKES Superior Court.

On an indictment, proper in form, defendant was charged with the murder of Shirley Ingram Billings. Upon call of the case for trial, the district attorney indicated that he would

seek a verdict of guilty of murder in the second degree or such verdict as the law and the evidence in the case may warrant. Defendant was convicted of second degree murder and sentenced to life imprisonment.

Defendant has been tried three times for this offense before Judge Thomas W. Seay, Jr. The first trial, held during the August 1976 Criminal Session of Wilkes Superior Court, ended in a mistrial due to the inability of the jury to reach a verdict. The second trial, at the September 1976 Session of Wilkes Superior Court, also ended in a mistrial when the jury failed to reach a verdict. We are concerned here with the third trial.

The evidence for the State tended to show the following:

The deceased, Shirley Billings, a middle-aged white woman, was stabbed to death in her mobile home located at Lowe's Motel in Wilkesboro about 8:30 p.m. E.S.T. on 23 April 1976. (We take judicial notice that on this date the sun set at approximately 7:00 p.m. E.S.T. *See The World Almanac and Books of Facts 1976* at 767-79.) She was found with a knife still in her side lying in a pool of blood. According to expert testimony, the cause of death was multiple, deep penetrating stab wounds.

About 8:30 p.m. Oscar Garcia, the night clerk at Lowe's Motel, received a telephone call from Room 47, which was the mobile home occupied by the deceased. When he picked up the telephone he heard a long scream of a woman. He dropped the telephone, ran outside the motel within view of the mobile home, and saw a black man, with bushy hair, wearing a light shirt and dark trousers running out of the mobile home. The mobile home was some 200 to 250 feet from the Lowe's Motel Office. No evidence was offered as to the outside lighting conditions at the motel. The black man ran in the direction of Room 40, defendant's room, before disappearing from view behind some parked cars. Defendant's room was at the end of the motel, 40 to 60 feet from the deceased's trailer.

Garcia ran to the deceased's mobile home, pushed open an already partially open door, and saw the body of the deceased on the floor. No one else was observed outside and no cars left the motel. Garcia returned to the office and called the owner of the motel, who in turn notified the police.

Wilkesboro Police, representatives of the sheriff's department, and SBI agents, all came to the scene that evening to in-

vestigate. Laney Vickers of the Wilkesboro Police arrived at 8:43 p.m. and found the defendant, a black man, standing outside his room, No. 40. Defendant was dressed in an off-white, long-sleeved shirt and dark pants. When asked what had happened, defendant replied that he did not know. Defendant indicated that he had not been inside the deceased's residence but had looked inside through the storm door. Defendant had been living at the motel for six to eight months and working for American-Drew Furniture Company.

No evidence of forced entry into the mobile home was found. The mobile home had only two entrances. The side door was padlocked. The body was lying about five feet from the main door near a sofa. The telephone was off the hook and the vacuum cleaner was still plugged in, close by the deceased's body. An effort was made to take fingerprints from the knife, but none were secured. The murder weapon was apparently a hot cutter's knife of the type used at Holly Farms Industries.

Steve Cabe, an SBI agent, talked with the defendant in his room about 9:00 p.m. Defendant told the agent that he went to a friend's room about 8:00 p.m.; that coming back to his room he walked in front of the deceased's trailer; that he heard the deceased call for him and figured that she had prepared some beans for him to eat, as she often did. He went into his room for a few minutes and then started back to the deceased's trailer. On his way, he met a man by the name of Howard Funk coming out of the mobile home and running very fast. Defendant stated that he then went to the trailer and looked inside and saw the deceased lying in a pool of blood. During this same conversation with SBI agent Cabe, the defendant also said he observed a black man with bushy hair coming out of the deceased's trailer who he thought was a Leech boy. Cabe observed the defendant wearing a brownish-red, long-sleeved shirt, a tee shirt and a pair of cordovan colored, wing-tipped, lace up shoes.

Later the same night at the Wilkes County Sheriff's Department, the defendant said that he had observed an unidentified white man coming from the deceased's home about 8:30 p.m. Defendant stated the man ran from the trailer and around behind the motel. Defendant emphatically repeated that he did not enter the deceased's mobile home that night. He reported that he had observed a Leech boy coming from the trailer and

indicated that he thought the Leech boy had killed Mrs. Billings. The tee shirt, the cordovan shoes and a pair of pants were taken from the defendant.

At Room 40 of the defendant, Jerry Garris of the Wilkes County Sheriff's Department, found an empty suitcase on the dresser, a small bowl of beans on a stand, and a "Holly Farms hot cutter" knife lying under a TV on top of the dresser. The room was searched with the defendant's permission.

Blood tests were made on blood extracted from the body of the deceased, defendant's blood and blood smears on the two shoes taken from the defendant. It was determined that the shoes had human blood on the toes which could not have come from the defendant. Approximately thirty percent of the population has the same blood type as found on defendant's right shoe and about fifteen percent has the same blood type as found on the left shoe. The expert testified that in his opinion the blood on both shoes could have come from the deceased, although he said the results as to the right shoe were inconclusive. The expert found six pinhead-sized specks of blood on the tee shirt.

A luminol test was made of the carpet of Room 40 of the defendant. In the test a reagent is sprayed on the floor. When it comes into contact with blood, it reacts and glows in the dark. The luminol examination in defendant's room produced several crescent-shaped reactions resembling the outline of the toe of a shoe. No evidence of a comparison of the reactions and defendant's shoes was introduced. Several officers entered the deceased's mobile home and later went into the defendant's room. These officers testified that they did not step in any blood in the mobile home.

Apparently, the bloodstains on defendant's tee shirt and the carpet in defendant's room could not be typed. No blood was apparently found on the trousers.

Defendant presented no evidence.

Other facts necessary to the decision will be related in the opinion.

*Attorney General Rufus L. Edmisten by Assistant Attorney General Isham B. Hudson, Jr., for the State.*

*Max F. Ferree and William C. Gray, Jr., for the defendant.*

COPELAND, Justice.

The only serious question raised by this appeal is whether the court was correct in denying defendant's motion for judgment as of nonsuit. The answer to this question depends upon whether there is substantial evidence to support a finding that the defendant was the perpetrator of the crime, it being conceded that there is substantial evidence that the crime charged was committed. We believe the evidence raises a strong suspicion as to defendant's guilt, but that it is *not* sufficient to remove the case from the realm of surmise and conjecture. *State v. Cutler*, 271 N.C. 379, 156 S.E. 2d 679 (1967); *State v. Bass*, 253 N.C. 318, 116 S.E. 2d 772 (1960).

It is elementary that, upon a motion for judgment as of nonsuit in a criminal case, the evidence must be considered by the court in the light most favorable to the State. Where there are contradictions and discrepancies in the evidence, these must be resolved in the State's favor and the State must be given the benefit of every reasonable inference arising on the evidence. *State v. Sellers*, 289 N.C. 268, 221 S.E. 2d 264 (1976); *State v. Bush*, 289 N.C. 159, 221 S.E. 2d 333 (1976); *State v. Cutler*, *supra.*

The case against this defendant is based entirely upon circumstantial evidence. The test of the sufficiency of the evidence to withstand a nonsuit motion is the same whether the evidence is circumstantial, direct or both. *State v. Thompson*, 256 N.C. 593, 124 S.E. 2d 728 (1962); *State v. Stephens*, 244 N.C. 380, 93 S.E. 2d 431 (1956).

> "When the motion for nonsuit calls into question the sufficiency of circumstantial evidence, the question for the court is whether a reasonable inference of defendant's guilt may be drawn from the circumstances. If so, it is for the jury to decide whether the facts, taken singly or in combination, satisfy them beyond a reasonable doubt that the defendant is actually guilty." *State v. Rowland*, 263 N.C. 353, 358, 139 S.E. 2d 661, 665 (1965); *accord, State v. Cutler, supra.*

In searching our reports of the many cases that recite the above principles of law, we find that it is much easier to state the rule than to apply it. Each case turns on its own peculiar facts and a decision in one case is rarely controlling in another. However, in *State v. Cutler, supra*, we find a case with facts

strikingly similar to those of the instant case. If anything, the State presented a stronger case against the defendant in *Cutler* and in that case we held that the motion for nonsuit should have been allowed.

In *Cutler*, the State's evidence tended to show that the deceased was found in his home stabbed through the heart, lying in a pool of blood. Blood was found throughout the house and inside the defendant's abandoned pickup truck parked nearby. The defendant was seen driving his truck up the lane to the deceased's house on the morning of the murder. Later the same morning, the defendant appeared at the home of his uncle intoxicated and "bloody as a hog." The defendant had a bad gash on his head. The defendant's knife blade was bloody and a hair stuck in the blood on the knife was similar to the chest hair of the deceased. An expert testified that the blood under the deceased's body and the blood inside the defendant's truck came from different persons. The blood on the defendant's clothing was identified as the same type as that taken from the truck. The blood on the knife was human blood but could not be typed. The defendant told his uncle that "Joe [the deceased] had killed himself." Defendant was taken by a neighbor to the hospital and, en route, told the neighbor he "would rather get a pint of liquor and go back and see how Joe was than go to the doctor." Upon these facts, Justice Lake, speaking for our Court in *Cutler*, found the evidence was not sufficient to defeat the motion for nonsuit although the evidence established that the defendant had an *opportunity* to commit the crime charged.

The evidence for the State in the case at bar was deficient in the following respects: (1) Garcia could not identify the man he saw leaving deceased's mobile home probably because of the distance (200-250 feet) and darkness (1½ hours after sunset). *See State v. Miller*, 270 N.C. 726, 154 S.E. 2d 902 (1967); (2) other black men were staying at the motel; (3) no evidence was presented that the defendant owned the murder weapon; (4) no fingerprints were found on the knife; (5) no evidence was introduced of any blood found on the defendant's pants; (6) about fifteen percent of the population has the type of blood found on the left shoe of the defendant; (7) the type of blood on the right shoe is found in thirty percent of the population; (8) the blood specks on the tee shirt, and the blood on the carpet were not identified by type or otherwise; (9) no mo-

tive was established for the crime; (10) no flight was attempted by the defendant.

The State has shown that the defendant was in the general vicinity of the deceased's home at the time of the murder and that he made several arguably contradictory statements during the course of the police investigation. It may even reasonably be inferred that the defendant was at the home of the deceased when the deceased came to her death, or shortly thereafter. Thus, the State has established that the defendant had an opportunity to commit the crime charged. *State v. Cutler,* *supra.* "Beyond that we must sail in a sea of conjecture and surmise. This we are not permitted to do." *State v. Minor,* 290 N.C. 68, 75, 224 S.E. 2d 180, 185 (1976); *accord, State v. Finney,* 290 N.C. 755, 228 S.E. 2d 433 (1976). Judge Seay should have allowed the motion for judgment as of nonsuit and his judgment is consequently

Reversed.