**STATE v. DAVIDSON**

[123 N.C. App. 326 (1996)]

STATE OF NORTH CAROLINA v. ROY LEE DAVIDSON, Defendant

No. COA95-1189

(Filed 6 August 1996)

### Homicide § 225 (NCI4th)— defendant as perpetrator—insufficiency of evidence

In a prosecution of defendant for second-degree murder, the evidence was insufficient to show that defendant was the perpetrator of the crime charged where it tended to show that defendant and the victim had an argument several days before the murder during which they threatened to kill each other; defendant heard a loud noise after he went to sleep which could have been a gunshot; defendant told an acquaintance during two separate arguments that he had killed the victim and he would do the same thing to the acquaintance; defendant told two other acquaintances that they would end up like the victim; the victim was found dead of a shotgun wound in a house which defendant owned and in which the victim lived; defendant and the victim were together, along with others, on the night of the murder; markings found on a fired shotgun shell found in defendant's house were consistent with the shotgun found in defendant's house; the same company manufactured the wadding found at the scene and the spent shotgun shell found in the gun; and a gunshot residue test found unusual amounts of barium and lead on defendant's hands which would be consistent with his having fired a gun in the hours before the test.

### Am Jur 2d, Homicide § 435.

Judge EAGLES dissenting.

Appeal by defendant from judgment entered 7 June 1995 by Judge Preston Cornelius in Iredell County Superior Court. Heard in the Court of Appeals 16 May 1996.

*Attorney General Michael F. Easley, by Associate Attorney General Melissa Taylor, for the State.*

*T. Michael Lassiter, P.A., by T. Michael Lassiter, for defendant-appellant.*

STATE v. DAVIDSON

[123 N.C. App. 326 (1996)]

WYNN, Judge.

Defendant Roy Lee Davidson appeals from his second degree murder conviction for the death of his roommate Booker T. Scott ("Scott").

The State's evidence tended to show the following: On 22 December 1990, the night before his death, Scott and defendant drank intoxicating beverages with several friends. Several people, including Dewey Campbell ("Campbell"), Timothy Miller ("Miller") and Deshawn Saddler ("Saddler"), entered and exited defendant's house during the course of the evening. Scott and defendant stayed up until approximately 5:00 a.m. before going to sleep.

Defendant awoke the next morning and noticed Scott lying on the couch. He left the house and came upon Campbell sometime between 8 and 9 a.m., as he walked back to the house. Both men entered the house and noticed that Scott was still lying on the couch. Campbell called out Scott's name. When Scott did not respond, Campbell assumed that he was asleep and went to the kitchen to have a drink of wine or beer with defendant. Defendant told Campbell that Scott had had a "rough night" and had been lying on the couch in the same position since five o'clock that morning.

After drinking with defendant for "a while", Campbell told defendant that it was strange for Scott to be asleep so long. Defendant told Campbell that Scott "might have Od'd" and that he might be dead. Campbell went over to Scott, and determined that he was not breathing. Defendant then left to get help while Campbell waited on the front porch.

At approximately 10:14 that morning, the Iredell County Emergency Medical Service ("EMS") paramedics arrived at the house. They found Scott lying on the couch, noticed a gunshot wound to his chest, pronounced him dead, and contacted the sheriff's department.

Gregory Johnson ("Johnson") was the first person from the Iredell County Sheriff's Department to arrive at the house. He spoke briefly with the EMS unit, then examined Scott's body. He immediately noticed a large hole in the center of Scott's chest and some blood around his shirt. He then searched for a weapon and found a sawed-off shotgun in the corner of the room where Scott's body was found.

Soon thereafter, defendant reentered the house because he wanted a drink. Johnson spoke with him and noticed that defendant

smelled like he had been drinking. Defendant told Johnson that he heard a loud noise during the night which may have been a gunshot.

Officer Bill Stamey ("Stamey") arrived soon after Johnson began speaking with defendant. He observed Scott's body and the shotgun. He then took a statement from defendant. Defendant told him that he had been drinking with Scott and Miller the previous night, and that they were in and out during the course of the evening. Defendant also told Stamey that Scott and Miller were arguing loudly, and as a result he left the room and went to sleep in another bedroom in the house. When he awoke a short time later, Miller had left and Scott was on the couch. Stamey took two subsequent statements from defendant which were similar to the first one given the morning that Scott's body was found.

Dr. Georgia Olympia, a pathologist, testified that she performed an autopsy on Scott, and determined that Scott died of a shotgun wound to the right side of his chest. Dr. Olympia testified that the shotgun was fired from within three feet of Scott.

Mr. Eugene Bishop ("Bishop"), a firearms identification expert, performed tests to determine if the shotgun found at the scene of the crime was the one used to shoot Scott. Bishop testified that he could not render an opinion as to whether the shotgun found at Davidson's house was the one used to kill Scott. Bishop further testified that the wadding found near Scott's body was manufactured by the same company which manufactured the spent shell found in the shotgun from the house.

Michael Creasy ("Creasy"), an expert in forensic chemistry, performed a gunshot residue test on wipings taken from defendant's hands at 5:50 p.m. on 23 December. Creasy testified that he could not render an opinion as to whether defendant had fired a gun in the hours leading up to the time his hands were wiped, although he found unusually high concentrations of barium and lead, two of the three elements he would expect to have found had defendant in fact fired a gun. On cross examination, Creasy testified that there are other ways in which defendant could have acquired the concentrations of barium and lead on his hands.

Campbell testified that defendant told him that he shot Scott, and that he would shoot Campbell as well. Campbell further testified that defendant later said that he "wouldn't do anything like that[,] you know I was joking." Miller and Saddler both testified that during argu-

STATE v. DAVIDSON

[123 N.C. App. 326 (1996)]

ments with defendant, he told them that they would "end up like [Scott]."

At the close of all evidence, defendant moved to dismiss the charges against him. The trial court denied his motion and submitted the charge of second-degree murder to the jury. From his conviction resulting in a ten year sentence, defendant appeals.

On appeal, Davidson contends that the trial court erred by failing to grant his motion to dismiss because the evidence was insufficient to establish that he was the murderer of Scott. We agree, and therefore reverse Davidson's conviction.

Upon a motion to dismiss by a defendant in a criminal case, the trial court "must view the evidence in the light most favorable to the State, giving the State the benefit of every reasonable inference to be drawn from it." *State v. Locklear*, 322 N.C. 349, 358, 368 S.E.2d 377, 382 (1988). The trial court should deny a criminal defendant's motion to dismiss "[i]f there is substantial evidence—whether direct, circumstantial, or both—to support a finding that the offense charged has been committed and that the defendant committed it." *Id.* at 358, 368 S.E.2d at 383. Whether the evidence constitutes substantial evidence is a question of law for the Court. *State v. Sexton*, 336 N.C. 321, 361, 444 S.E.2d 879, 902, *cert. denied*, —— U.S.——, 130 L. Ed. 2d 429 (1994). Substantial evidence is evidence that is "existing and real, not just seeming or imaginary." *Id.* (quoting *State v. Powell*, 299 N.C. 95, 99, 261 S.E.2d 114, 117 (1982)). Substantial evidence is "relevant evidence that a reasonable mind might accept as adequate to support a conclusion." *State v. Vick*, 341 N.C. 569, 583-84, 461 S.E.2d 655, 663 (1995). The test of the sufficiency of the evidence to withstand a motion to dismiss,

> [I]s the same whether the evidence is direct, circumstantial or both . . . . [W]hen the motion . . . calls into question the sufficiency of the evidence, the question for the court is whether a reasonable inference of defendant's guilt may be drawn from the circumstances. If so, it is for the jury to decide whether the facts, taken singly or in combination, satisfy them beyond a reasonable doubt that the defendant is actually guilty.

*Powell*, 299 N.C. at 99, 261 S.E.2d at 117.

Our Supreme Court has stated that in cases where the issue is whether the State has presented sufficient evidence to withstand defendant's motion to dismiss, "[w]e find that it is much easier to

state the rule than to apply it. Each case turns on its own peculiar facts and a decision in one case is rarely controlling in another." *State v. White*, 293 N.C. 91, 95, 235 S.E.2d 55, 58 (1977); *see also State v. Cutler*, 271 N.C. 379, 156 S.E.2d 679 (1967). Nevertheless, prior cases can be instructive in determining whether a defendant's motion to dismiss should have been granted in a given case. *White*, 293 N.C. at 95-96, 235 S.E.2d at 58.

In the instant case, defendant concedes that there was sufficient evidence presented to permit the jury to find that the offense charged—homicide occurring by use of a shotgun—was in fact committed. As a result, the only issue before this Court is whether sufficient evidence was presented that defendant was the perpetrator of the shooting. We hold that there was not.

Evidence in the instant case, in the light most favorable to the State, can be summarized as follows: Several days before the murder, defendant and Scott had an argument during which they threatened to kill each other; defendant heard a loud noise after he went to sleep, which could have been a gunshot; defendant told Campbell during two separate arguments that he killed Scott, and he would "do the same thing" to Campbell; defendant told Miller and Saddler during arguments that they would end up like Scott; Scott was found dead of a shotgun wound in a house which defendant owned and in which Scott lived; defendant and Scott were together, along with others, on the night Scott was killed; markings found on a fired shotgun shell found in defendant's house were consistent with the shotgun found in defendant's house; the same company manufactured the wadding found at the scene and the spent shotgun shell found in the gun; and, a gunshot residue test found unusual amounts of barium and lead on defendant's hands which would be consistent with his having fired a gun in the hours before the test.

This evidence, taken together,

> [E]stablishes a murder; and considered in the light most favorable to the State, shows that the defendant had the opportunity, means and perhaps the mental state to have committed this murder. Such facts, taken in the strongest view adverse to defendant, . . . excite suspicion in the just mind that he is guilty, but such view is far from excluding the rational conclusion that some other unknown person may be the guilty party.

*State v. Lee*, 294 N.C. 299, 303, 240 S.E.2d 449, 451 (1978).

In *Lee*, our Supreme Court affirmed this Court's holding that the trial court should have granted defendant's motion to dismiss the murder charges against him despite the fact that the State's evidence tended to show that the defendant "beat the victim on two occasions just before her death, and . . . threatened to kill the victim a day or two before her death." *Id*. The Court in *Lee* conceded that the State's evidence may have been sufficient to establish the defendant's *mens rea*, but held that dismissal was nevertheless required because the State did not offer substantial evidence that defendant actually committed the act of murder, and "[t]he criminal act cannot be inferred from evidence of state of mind alone." *Id*.

The evidence of motive was substantially stronger in *Lee* than in the instant case. In *Lee*, there was evidence that the defendant beat the victim in the days before she was murdered. In the instant case, the evidence showed an argument wherein defendant and Scott threatened to kill each other. There was no evidence of actual violence before the murder. In both *Lee* and the case *sub judice*, there was little or no physical evidence that the defendant actually committed the murder.

In *Cutler*, 271 N.C. 379, 156 S.E.2d 679, the evidence tended to show that:

[T]he deceased was found in his home stabbed through the heart, lying in a pool of blood. Blood was found throughout the house and inside the defendant's abandoned pickup truck parked nearby. The defendant was seen driving his truck up the lane to the deceased's house on the morning of the murder. Later the same morning, the defendant appeared at the home of his uncle intoxicated and "bloody as a hog." The defendant had a bad gash on his head. The defendant's knife blade was bloody and a hair stuck in the blood on the knife was similar to the chest hair of the deceased. An expert testified that the blood under the deceased's body and the blood inside the defendant's truck came from different persons. The blood on the defendant's clothing was identified as the same type as that taken from the truck. The blood on the knife was human blood but could not be typed. The defendant told his uncle that "Joe [the deceased] had killed himself." Defendant was taken by a neighbor to the hospital and, en route, told the neighbor he "would rather get a pint of liquor and go back and see how Joe was than go to the doctor."

*White*, 293 N.C. at 96, 235 S.E.2d at 58-59.

The physical evidence in *Cutler* was stronger than that in the instant case. In *Cutler*, the defendant was found with a knife blade which was bloody and had a hair stuck to it. The hair was similar to a chest hair of the deceased, who was murdered by being stabbed through the heart. The defendant himself was bloody and had a gash on his head. The defendant's truck had blood in it, which was not the blood of the deceased, but may have been defendant's. Despite the fact that the defendant was clearly in a violent altercation, and possessed a knife with a hair stuck to it similar to that of the victim, the Court in *Cutler* held:

> [The evidence was] sufficient to raise a strong suspicion of the defendant's guilt but not sufficient to remove that issue from the realm of suspicion and conjecture. It may reasonably be inferred that the defendant was at the home of the deceased when the deceased came to his death, or shortly thereafter. However, it is not enough to defeat the motion for nonsuit that the evidence establishes that the defendant had an opportunity to commit the crime charged.

*Cutler*, 271 N.C. at 383, 156 S.E.2d at 682.

In the instant case, the physical evidence, in its entirety, consisted of the fact that a shotgun found in defendant's house *may* have been the gun used to kill Scott, and residue found on defendant's hands indicate that he *may* have fired a gun in the hours before the test, although the expert witness explicitly testified that he could not render an opinion as to whether Davidson had in fact fired a gun in that time frame. Such evidence is insufficient to remove the issue of defendant's guilt or innocence "from the realm of speculation and conjecture." *See Id.* As our Supreme Court stated in *State v. Malloy*, 309 N.C. 176, 179, 305 S.E.2d 718, 720 (1983), "[i]f . . . the evidence . . . is sufficient only to raise a suspicion or conjecture as to . . . the identity of the defendant as the perpetrator, the motion to dismiss must be allowed . . . . This is true even though the suspicion aroused by the evidence is strong."

Following the precedent of our Supreme Court, as we must, we conclude that defendant's conviction must be, and therefore is,

Reversed.

Judge SMITH concurs.

Judge EAGLES dissents.

**STATE v. DAVIDSON**

[123 N.C. App. 326 (1996)]

Judge EAGLES dissenting.

The majority holds that the State did not present substantial evidence to support the finding that defendant committed the offense charged. I respectfully dissent.

In deciding whether to deny a defendant's motion to dismiss based on insufficiency of the evidence in a criminal case, the trial court must "view the evidence in the light most favorable to the State, giving the State the benefit of every reasonable inference to be drawn from it." *State v. Locklear*, 322 N.C. 349, 358, 368 S.E.2d 377, 382 (1988). The State must have presented substantial evidence that supports a finding that the offense charged was committed and that defendant committed it. *Id.* at 358, 368 S.E.2d at 383. To support a finding that defendant committed the offense charged, the evidence must be sufficient to allow "a reasonable inference of defendant's guilt of the crime charged [to] be drawn from the evidence." *State v. Powell*, 299 N.C. 95, 99, 261 S.E.2d 114, 117 (1980) (emphasis omitted).

The evidence the State presented tends to show the following facts:

On 20 December 1990, defendant argued with the victim and threatened to kill him. Two days later, defendant and the victim were together at various times at defendant's house, where they both lived. Both were drinking intoxicating beverages and socializing with friends. By the early morning hours of 23 December 1990, the victim, known to carry a shotgun with him everywhere, had fallen asleep on a sofa in the front room of defendant's house. Later in the morning, the victim was found lying on that sofa, dead from a shotgun wound to the chest.

Defendant was in his house during the early morning hours of 23 December 1990. Defendant claims that he was asleep in another room and heard a noise like a stick falling, but did not investigate.

At trial, Campbell, a friend of defendant and the victim, testified that, after the victim's death, Campbell argued twice with defendant. During both of these arguments, defendant stated, "I killed [the victim], and I'll kill you too." Two other friends of defendant testified that defendant had warned them separately to "watch out" or they would "end up like [the victim]."

Special Agent Creasy, a forensic chemist with the State Bureau of Investigation, gave expert testimony establishing that he performed a gunshot residue analysis on hand wipes taken from defendant on the day of the victim's death. Creasy testified that, based on this analysis, he "could not reach a definitive opinion with regard to whether or not [defendant] could or could not have fired a weapon" on the day of the victim's death; however, he testified that his findings were unusual, in that tests revealed significant concentrations of two of the three chemical elements tested for in gunshot residue, and, given the location of residue found on defendant's hand, these concentrations did not indicate mere environmental contamination.

There was also expert testimony as to the proximity of the murder weapon to the victim at the time of death. Dr. Georgia Olympia, a pathologist who performed the autopsy on the victim, testified that the victim died from a shotgun blast which originated within three feet of the victim. Special Agent Bishop, a State Bureau of Investigations expert in firearms identification, corroborated Dr. Olympia's finding, testifying that, if the victim's shotgun was the murder weapon, the muzzle of the gun "had to be less than three feet away" from the victim when fired.

Bishop further testified as to whether the victim's shotgun was the murder weapon. On the day of the victim's death, police found the victim's shotgun in the front room, a distance of twelve to fourteen feet from the victim's body. In the shotgun was a spent shell casing. Bishop testified that this spent shell casing was manufactured by the same company as the wadding found in the victim's wound and this shell casing was of the same type as shotgun pellets found in the victim's wound. He also stated that he had compared the discharged shell found in the victim's gun to a similar shell test fired from the subject weapon and concluded that the two had similar markings. Bishop testified he could not determine whether the discharged shell had been fired by the victim's shotgun; however, he explained that it is not unusual for this comparison test to lead to uncertain results.

Considering all this evidence in the light most favorable to the State, there was substantial evidence presented that defendant committed the offense charged. The State presented evidence that the victim died in defendant's house from a shotgun wound to the chest; defendant was in the house at the time of the offense; a shotgun was found in the same room as the victim, but outside of his reach;

defendant had access to the shotgun; tests were consistent with the shotgun being the murder weapon; defendant threatened to kill the victim just days before the victim's death; defendant later admitted to a witness that he had killed the victim; defendant knew the victim well; the victim was shot at close range; and the results of defendant's hand wipe analysis were consistent with defendant having fired a gun on the day of the victim's death. This evidence is sufficient to allow "a reasonable inference of defendant's guilt of the crime charged [to] be drawn from the evidence." *Powell*, 299 N.C. at 99, 261 S.E.2d at 117.

The majority cites *State v. Lee*, 294 N.C. 299, 240 S.E.2d 449 (1978) and *State v. Cutler*, 271 N.C. 379, 156 S.E.2d 679 (1967) to support its reversal of the trial court's judgment. Both are distinguishable in that in neither of those cases was there an admission of guilt from defendant. *Lee*, 294 N.C. 299, 240 S.E.2d 449; *Cutler*, 271 N.C. 379, 156 S.E.2d 679.

In *State v. Lambert*, 341 N.C. 36, 460 S.E.2d 123 (1995), there was evidence presented of an admission of guilt from defendant and as *Lambert* indicates, the sparsity of physical evidence in the case *sub judice* does not bar the Court from upholding the trial court's ruling. In *Lambert*, as in the case *sub judice*, defendant was on trial for murder and an issue on appeal was whether the trial court erred in denying defendant's motion to dismiss based on insufficiency of the evidence. *Id.* The evidence, viewed in the light most favorable to the State, was that the victim was shot in his trailer while sleeping; defendant, the wife of the victim, was in the trailer at the time; defendant had access to the murder weapon; the victim was planning to leave the defendant because of her alcohol and cocaine abuse; and defendant made self-incriminating statements, whereby she admitted to the crime. *Id.* The State was unable to find latent fingerprints on the murder weapon and gunshot residue tests on defendant's hand wipes produced negative results. *Id.* Despite the lack of physical evidence, our Supreme Court upheld the trial court's denial of defendant's motion to dismiss, holding that the State presented "substantial evidence adequate to support the conclusion by a reasonable mind that defendant committed the crime of murder." *Id.* at 43, 235 S.E.2d at 127.

For the reasons stated, I respectfully dissent.