IN THE COURT OF APPEALS OF NORTH CAROLINA

2021-NCCOA-405

No. COA20-362

Filed 3 August 2021

Rowan County, No. 16 CRS 052274-75, 19 CRS 1637

STATE OF NORTH CAROLINA

v.

DAVID MYRON DOVER, Defendant.

Appeal by Defendant from judgments entered 19 September 2019 by Judge Richard S. Gottlieb in Rowan County Superior Court. Heard in the Court of Appeals 9 February 2021.

*Attorney General Joshua H. Stein, by Special Deputy Attorney General K. D. Sturgis, for the State.*

*Marilyn G. Ozer for defendant-appellant.*

MURPHY, Judge.

¶ 1    When the State presents evidence that raises a strong suspicion of a defendant's guilt, but does not remove the case from the realm of surmise and conjecture, the trial court errs in denying the defendant's motion to dismiss for insufficiency of the evidence. Here, the circumstantial evidence presented at trial showed Defendant had an opportunity to commit the crime charged, but there was not evidence, even when viewed in the light most favorable to the State, that a

reasonable mind could accept to support the conclusion that Defendant robbed and murdered the victim.

## BACKGROUND

On 16 May 2016, Defendant David Myron Dover was indicted on one count of robbery with a dangerous weapon, one count of first-degree murder, and having attained the status of habitual felon. A jury was impaneled for Defendant's trial on 9 September 2019. The evidence at trial tended to show the following:

On the morning of 10 May 2016, Arthur "Buddy" Davis ("Mr. Davis") was scheduled to meet one of his daughters, April Anderson, at 7:00 a.m. to give her an unknown sum of money. When he did not show up, Anderson called Mr. Davis's place of employment, Terry's Auto Sales, and asked to "speak to Buddy[.]" Anderson was told Mr. Davis was not at work.

Anderson then called her sister, Charlotte Davis ("Davis"), who directed her husband, Waylon Barber, to go to Mr. Davis's mobile home in Kannapolis to check on him. Contemporaneously, the owner of Terry's Auto Sales, Terry Bunn, was concerned about Mr. Davis not showing up at work and decided to go to Mr. Davis's mobile home to check on him. Bunn arrived at the mobile home before Barber and, after knocking on the door and receiving no answer, "slid [a screwdriver] in behind the door . . . [and] jimmied the door open." Bunn entered the home, called Mr. Davis's name, and observed "something [that] had a real brown look to it" in the kitchen,

which he realized was blood. Bunn then walked to the bedroom, where he found Mr. Davis lying unconscious on the floor and called 911. Barber arrived shortly thereafter and also called 911. Paramedics arrived at the mobile home and declared Mr. Davis dead. According to expert testimony, the cause of Mr. Davis's death was multiple stab wounds. No evidence of forced entry into the mobile home was found. The time of Mr. Davis's death could not be determined with accuracy and a murder weapon was never identified.

¶ 5        Officers who responded to the 911 calls identified a list of possible suspects, including Defendant. Defendant lived in Rowan County and worked at Terry's Auto Sales with Mr. Davis. Due to a crack cocaine substance abuse problem, Defendant frequently borrowed small amounts of cash from various people in the community, including Mr. Davis, and failed to pay them back.

¶ 6        After the investigation at Mr. Davis's mobile home concluded, some officers went to locate the other possible suspects. Contemporaneously, other officers went by Defendant's house, located in China Grove, "to kind of get a feel of where [he] lived at." As the officers were leaving the area, they saw Defendant "pull in, driving." The officers knew Defendant previously had his driver's license revoked and contacted the Rowan County Sheriff's Office to advise them Defendant was driving without a license. The Rowan County Sherriff's Office took out a warrant for Defendant for driving while license revoked, but service of the warrant was held off.

¶ 7        That same day, officers returned to Defendant's house.  Defendant and his girlfriend, Carol Carlson, who Defendant lived with, came outside the house to speak with the officers.  Defendant and Carlson agreed to let the officers search their house.  As a result of the search, an officer seized two shirts and a pair of blue jeans located in the back bedroom of Defendant's house.  According to the officer, these items were seized "[b]ecause they had blood stains or what appeared to be blood stains on the shirts and on the back of the blue jeans."  Blood DNA tests were done comparing the blood stains on the clothing seized from Defendant's house and the blood at the scene of the crime with Defendant's blood and Mr. Davis's blood.  Forensic biologists testified there was no connection between Defendant's DNA profile and the scene of the crime, and no connection between the blood stains on Defendant's clothes and Mr. Davis's DNA profile.

¶ 8        After the officers finished searching the house, Defendant agreed to go to the Kannapolis police department to talk about Mr. Davis's death.  As they were leaving, Carlson asked Defendant for money because she was hungry, and Defendant gave her $20.00 from cash that he had in his pocket at the time.

¶ 9        Defendant's interview at the police department was video recorded and played for the jury.  When asked about his whereabouts on the evening of 9 May 2016, Defendant stated he returned home at about 8:00 or 9:00 p.m. and did not leave his house for the remainder of the evening.  Later during the interview, Defendant

changed his story and stated that on 9 May 2016, he purchased "a dime" of crack cocaine, brought it back to Terry's Auto Sales, and smoked it before he did more work and later went home. He also stated he tried to call Mr. Davis two or three times to borrow $20.00 at about 10:00 p.m., but Mr. Davis never picked up the phone. Defendant told the officers that occasionally, Mr. Davis tells him he isn't going to loan him any more money, but Mr. Davis recently loaned him $20.00 on the previous Sunday.

¶ 10        Defendant gave the interviewing officers permission to inspect his cell phone in an attempt to corroborate his story. Officers attempted to retrieve data from Defendant's cell phone using a Cellebrite forensic device, but due to the age of the phone, the data could not be retrieved. Instead, the officers manually searched the cell phone's contents. The manual search revealed the only calls in the cell phone's call history were those made after Defendant had been in the presence of the officers, and the only text message history was one text message received from Carlson on 10 May 2016.

¶ 11        The State also presented location records of Defendant's cell phone on the night of 9 May 2016. According to expert testimony from Special Agent Michael Sutton, Defendant's cell phone records were assessed to determine which cell towers and sectors were utilized by his phone in order to map its location. Because "[m]ost towers are sectorized to increase the number of customers it can serve[,]" cell phone carriers

put "three towers on one pole, pointing in different directions." Special Agent Sutton looked at "the topography of the area, the layout of the area, as well as associating the other towers to come up with an estimated service area of [a] particular tower," and determined the general area and sector of where Defendant's phone was when it was being used.

¶ 12     The cell tower records showed Defendant made calls at 9:46 p.m., 10:21 p.m., 10:22 p.m., and 10:23 p.m. on 9 May 2016 from a sector that included his residence in China Grove. The cell tower records also showed Defendant made calls at 11:22 p.m., 11:30 p.m., 11:31 p.m., and 11:32 p.m. on 9 May 2016 from a sector that included both Mr. Davis's mobile home and Terry's Auto Sales. On 10 May 2016, the cell tower records showed Defendant made calls at 12:00 a.m., 12:11 a.m., and 12:12 a.m. from a sector that included the home of Defendant's drug dealer. Also, on 10 May 2016, Defendant again made calls between 12:49 a.m. and 1:29 a.m. from the sector that included his residence in China Grove.

¶ 13     Officers asked Defendant where he obtained the money he gave to Carlson prior to the interview. He stated he had $300.00 or $400.00 from a customer whose car he put a transmission in, but it was Bunn's money since Bunn gave him an advance on the money Defendant was to receive for the transmission work.

¶ 14     After the interview concluded, Defendant went outside the Kannapolis Police Department and waited to be transported back to his house. While waiting,

Defendant was arrested on the outstanding warrant for driving while license revoked. Defendant was transported to jail where he declined to be interviewed a second time.

¶ 15 While in jail, Defendant made a telephone call to Carlson on a monitored phone line. The audio recording of this phone call was played for the jury. While on the phone, Defendant instructed Carlson to look in a trash can for a stack of approximately $3,000.00 in cash, inside a work glove, which was in turn inside a McDonald's bag, and instructed her to use the cash to pay his bail. Carlson located the money and used $1,000.00 of it for Defendant's bail money. Officers recovered the remainder of the money, $1,724.00, from a wallet in Carlson's purse. The majority of the cash was in one-hundred-dollar bills. Officers were later able to recover the McDonald's bag and the empty work glove inside of it from a garbage can across the street from Defendant's house, at Carlson's mother's house.

¶ 16 At the close of the State's evidence, Defendant made a motion to dismiss all charges "for failure to provide evidence as to each element of each crime[.]" The trial court denied the motion to dismiss. At the close of all evidence, Defendant renewed the motion to dismiss all charges, citing "insufficiency of the evidence" as the basis for the motion. The trial court denied the renewed motion.

¶ 17 During closing arguments, the State argued to the jury:

> Admittedly, we don't have DNA in this case. We don't. There's always going to be something you can look at in a crime scene investigation and say it wasn't done. Short of

> us literally picking up the entire trailer and moving [it to] a warehouse and going through it with microscopes, there's always going to be something you can point out that wasn't done. We do the reasonable things, the things that lead to evidence that we believe might produce evidence. One way or the other, we're going to run down your alibi, just like we run down allegations against you, and that was done in this case, time and time again. The problem is, every time they went to check on something that [Defendant] had told them, it was a lie. And everybody else was telling the truth. Everything checked out. But nothing he had to say checked out, and he's telling you ridiculous things. Ridiculous.
>
> You need a reasonable explanation for that money. If you don't have a reasonable explanation for where that money came from --

Defendant then objected and the trial court sustained the objection; however, the trial court did not give a curative instruction. After the conclusion of the State's closing argument, Defendant moved for a mistrial based on the lack of a curative instruction. The trial court denied the motion.

¶ 18     The jury found Defendant guilty of felony murder, based on the underlying felony of robbery with a dangerous weapon, and first-degree murder on the basis of malice, premeditation, and deliberation. The jury also found Defendant guilty of robbery with a dangerous weapon. The trial court sentenced Defendant to life without parole on the first-degree murder conviction and arrested judgment on the robbery with a dangerous weapon conviction. Defendant timely appealed.

## ANALYSIS

¶ 19        On appeal, Defendant argues the trial court erred by (A) denying his motion to

dismiss all the charges for insufficiency of the evidence, and (B) denying his motion

for a mistrial when the trial court failed to give a curative instruction during the

prosecutor's improper closing statement.  We agree with Defendant that the trial

court erred by denying his motion to dismiss all the charges and vacate his

convictions.

### A. Motion to Dismiss

¶ 20        "This Court reviews the trial court's denial of a motion to dismiss *de novo*."

*State v. Smith*, 186 N.C. App. 57, 62, 650 S.E.2d 29, 33 (2007).  "When reviewing a

defendant's motion to dismiss for insufficient evidence, [we] must inquire whether

there is substantial evidence of each essential element of the crime and that the

defendant is the perpetrator." *State v. Campbell*, 373 N.C. 216, 220, 835 S.E.2d 844,

848 (2019) (marks omitted).  "Substantial evidence is such relevant evidence as a

reasonable mind might accept as adequate to support a conclusion." *Smith*, 186 N.C.

App. at 62, 650 S.E.2d at 33.

¶ 21        However, "[i]f the evidence is sufficient only to raise a suspicion or conjecture

as to either the commission of the offense or the identity of the defendant as the

perpetrator of it, the motion [to dismiss] should be allowed." *State v. Powell*, 299 N.C.

95, 98, 261 S.E.2d 114, 117 (1980).  This is true even if "the suspicion so aroused by

the evidence is strong." *Id.*  "In making its determination, the trial court must

consider all evidence admitted, whether competent or incompetent, in the light most favorable to the State, giving the State the benefit of every reasonable inference and resolving any contradictions in its favor." *State v. Rose*, 339 N.C. 172, 192, 451 S.E.2d 211, 223 (1994), *cert. denied*, 515 U.S. 1135, 132 L. Ed. 2d 818 (1995).

¶ 22        We begin by noting the evidence we rely on to analyze the murder charges is the same evidence we rely on to analyze the robbery with a dangerous weapon charge. As such, we discuss the sufficiency of the evidence presented for the first-degree murder charge, the felony murder charge, and the robbery with a dangerous weapon charge together. We hold the evidence, even when viewed in the light most favorable to the State, was insufficient to go to the jury.

¶ 23        Defendant argues "[t]he State failed to present any evidence that [Defendant] entered the trailer of [Mr. Davis] and committed murder" and "[t]he State failed to present any evidence connecting [the $3,000.00 in cash] with [the victim]."

¶ 24        The State contends there was evidence presented that "a reasonable mind might accept as adequate to support [the] conclusion" that Defendant murdered and robbed Mr. Davis. *Smith*, 186 N.C. App. at 62, 650 S.E.2d at 33. The evidence favorable to the State included: Defendant lied to the police and changed his story as to his whereabouts on the night of the murder; cell tower records placed Defendant

in the same vicinity as Mr. Davis's mobile home on the night of the murder;[1] Defendant deleted his cellphone call and text messaging history; there was no forced entry in Mr. Davis's mobile home, suggesting he knew the perpetrator; the fact that Defendant was in possession of $3,000.00 in cash with no explanation of where it came from; Mr. Davis's wallet and any cash he may have had were missing from his mobile home; Bunn's testimony that Mr. Davis usually "carried a lot of cash on him" and kept cash in his wallet; Mr. Davis planned to meet his daughter the morning after the murder to bring her money; Defendant's continued asking to borrow money from Mr. Davis; and Mr. Davis told Defendant a few days before his death he refused to loan Defendant any more money. The State's evidence in this case establishes Mr. Davis was murdered, and "[i]t shows that [Defendant] had the opportunity to commit it and begets suspicion in imaginative minds. All the evidence engenders the question, if [D]efendant didn't kill [the victim], who did? To raise such a question, however, will not suffice to sustain a conviction." *State v. Jones*, 280 N.C. 60, 66, 184 S.E.2d 862, 866 (1971) (marks and citations omitted).

¶ 25        The State urges we can infer Defendant's motive for murdering Mr. Davis was because Mr. Davis "has been known to carry around large amounts of cash" and

---

[1] We note that while the State's evidence shows that Defendant may have been in the general vicinity of the victim's mobile home, this general vicinity also overlaps with Terry's Auto Sales, Defendant's employer, and a location where Defendant is often present.

Defendant was in possession of a large amount of cash immediately after the murder. In light of Mr. Davis's scheduled meeting with his daughter on 10 May 2016 where he planned to give her money, the jury could reasonably infer Mr. Davis had cash in his mobile home. However, it is too speculative to assume Mr. Davis had thousands of dollars' worth of one-hundred-dollar bills when there is nothing in the Record to support this assumption, especially considering the Record contains no indication that Mr. Davis ever loaned anyone more than $20.00 or $50.00. Assuming Mr. Davis possessed a large amount of cash at the time of his murder, the State failed to present sufficient evidence that Defendant was the one who took and carried away the cash from the victim. Rather, the evidence simply established that Defendant had an opportunity to steal the money at issue. "Under well-settled caselaw, evidence of a defendant's mere opportunity to commit a crime is not sufficient to send the charge to the jury." *Campbell*, 373 N.C. at 221, 835 S.E.2d at 848.

¶ 26      *State v. White* illustrates the principle that a conviction cannot be sustained if the most the State has shown is the defendant was in an area where he could have committed the crime. *State v. White*, 293 N.C. 91, 235 S.E.2d 55 (1977). In *White*, the defendant was charged with second-degree murder after a woman was found stabbed to death in her mobile home located outside of a motel where the defendant was staying at the time. *Id.* at 96-97, 235 S.E.2d at 59. There was testimony that a motel employee heard a woman scream and then saw a man run out of the victim's

mobile home and head in the direction of the defendant's motel room. *Id.* at 92, 235 S.E.2d at 56. Officers found traces of blood on the defendant's shoes and shirt, but the DNA analysis failed to match the blood to the victim. *Id.* at 96, 235 S.E.2d at 59. Our Supreme Court held that, although "the evidence raises a strong suspicion as to [the] defendant's guilt[,]" it was "not sufficient to remove the case from the realm of surmise and conjecture." *Id.* at 95, 235 S.E.2d at 58. Our Supreme Court acknowledged the State's evidence established that the defendant was in the general vicinity of the victim's residence at the time of the murder, the defendant gave contradictory statements to law enforcement officers, and it could "even reasonably be inferred that the defendant was at the home of the deceased when the deceased came to her death, or shortly thereafter." *Id.* at 97, 235 S.E.2d at 59. Nevertheless, our Supreme Court reversed the defendant's conviction. *Id.*

¶ 27 Here, the State offered evidence that the victim "has been known to carry around large amounts of cash"; the victim planned to bring money to his daughter on the morning he was found murdered, although it is unknown how much money; Defendant was a crack cocaine addict who frequently borrowed small amounts of money from various people in the community, including the victim; Defendant was in possession of approximately $3,000.00 in cash after the murder and concealed that cash outside his girlfriend's mother's house; Defendant was in the vicinity of the victim's residence for a period of time on the night of the murder; Defendant changed

his story and gave contradictory statements to law enforcement officers; and Defendant deleted all call and text message history from his cellphone except for the calls and text messages from the morning the victim was discovered murdered. This evidence may be fairly characterized as raising a suspicion of Defendant's guilt, but crucial gaps existed in the State's evidence. The State failed to link Defendant to the stolen cash or prove that the $3,000.00 worth of one-hundred-dollar bills Defendant hid in the McDonald's bag in the trash can was cash stolen from the victim's mobile home. "The full summary of the incriminating facts, taken in the strongest view of them adverse to [Defendant], excite[s] suspicion in the just mind that he is guilty, but such view is far from excluding the rational conclusion that some other unknown person may be the guilty party." *Jones*, 280 N.C. at 66, 184 S.E.2d at 866 (marks omitted).

¶ 28     "The State has shown that [] [D]efendant was in the general vicinity of the deceased's home at the time of the murder and that he made several arguably contradictory statements during the course of the police investigation." *White*, 293 N.C. at 97, 235 S.E.2d at 59. However, "the State has [only] established that [] [D]efendant had an opportunity to commit the crime charged." *Id.* To infer anything "[b]eyond that we must sail in a sea of conjecture and surmise. This we are not permitted to do." *Id.* There was no evidence beyond mere speculation that Defendant was at the scene of the crime, had a motive to commit these crimes, or that Defendant

actually committed the crimes. Although "[t]he circumstances raise a strong suspicion of [D]efendant's guilt, . . . we are obliged to hold that the State failed to offer substantial evidence that [D]efendant was the one who [stabbed the victim]." *Jones*, 280 N.C. at 67, 184 S.E.2d at 866. There is insufficient evidence to establish Defendant was the perpetrator of the murder and the robbery.

¶ 29        "We believe the evidence raises a strong suspicion as to [D]efendant's guilt, but that is not sufficient to remove the case from the realm of surmise and conjecture." *White*, 293 N.C. at 95, 235 S.E.2d at 58. We find the Record is insufficient to show more than a suspicion that Defendant murdered Mr. Davis and robbed him with a dangerous weapon. "Because there was insufficient evidence to support the commission of the underlying felony, there is also insufficient evidence to support [D]efendant's conviction of felony murder." *State v. Bates*, 309 N.C. 528, 535, 308 S.E.2d 258, 263 (1983). The trial court erred in denying Defendant's motion to dismiss all charges and we reverse the trial court's ruling on the motion to dismiss and vacate his convictions.

## B. Motion for a Mistrial

¶ 30        Defendant also argues "the [trial] court erred by failing to promptly cure the prosecutor's improper [closing] argument which shifted the burden of proof to [] Defendant" and the trial court should have granted his motion for a mistrial. Our holding in Part A–that the trial court erred in denying Defendant's motion to dismiss

all charges–renders Defendant's second argument, regarding his motion for a mistrial, moot. *See State v. Angram*, 270 N.C. App. 82, 88, 839 S.E.2d 865, 869 (2020) ("Because we must reverse the judgment, we need not address [the] defendant's other issue on appeal."). As we agree with Defendant's first argument, we must reverse the trial court's ruling on the motion to dismiss all charges, as well as vacate Defendant's judgments, and we need not address Defendant's other issue on appeal.

## CONCLUSION

The State failed to present substantial evidence that Defendant was the perpetrator of any of the crimes he was tried upon. The trial court erred in denying Defendant's motion to dismiss all charges. We reverse its ruling and vacate Defendant's convictions.

REVERSED.

Judge DILLON concurs.

Judge ARROWOOD dissents with separate opinion.

ARROWOOD, Judge, dissenting.

I respectfully dissent from the majority's holding that the trial court erred in denying defendant's motion to dismiss for insufficient evidence. Although the majority's holding does not reach defendant's motion for a mistrial, I also would hold that the trial court properly denied defendant's motion. I would affirm the trial court's order and uphold defendant's convictions.

## I.    Motion to Dismiss for Insufficient Evidence

In ruling on a motion to dismiss, "the trial court need determine only whether there is substantial evidence of each essential element of the crime and that the defendant is the perpetrator." *State v. Winkler*, 368 N.C. 572, 574, 780 S.E.2d 824, 826 (2015) (internal quotation marks and citation omitted). Substantial evidence is defined by the North Carolina Supreme Court as "evidence which a reasonable mind could accept as adequate to support a conclusion." *State v. Lee,* 348 N.C. 474, 488, 501 S.E.2d 334, 343 (1998) (citing *State v. Vick,* 341 N.C. 569, 583-84, 461 S.E.2d 655, 663 (1995)). In reviewing the trial court's decision on appeal, the evidence must be viewed "in the light most favorable to the State, giving the State the benefit of all reasonable inferences." *State v. Barnes*, 334 N.C. 67, 75, 430 S.E.2d 914, 918 (1993) (citation omitted).

In order to be submitted to the jury for determination of defendant's guilt, the evidence "need only give rise to a reasonable inference of guilt." *State v. Turnage*, 362 N.C. 491, 494, 666 S.E.2d 753, 755 (2008) (citing *State v. Stone,* 323 N.C. 447,

452, 373 S.E.2d 430, 433 (1988)). This is true regardless of whether the evidence is direct or circumstantial. *State v. Trull,* 349 N.C. 428, 447, 509 S.E.2d 178, 191 (1998). If the court decides that a reasonable inference of the defendant's guilt may be drawn from the circumstances, then "it is for the jury to decide whether the facts, taken singly or in combination, satisfy them beyond a reasonable doubt that the defendant is actually guilty." *State v. Thomas*, 296 N.C. 236, 244, 250 S.E.2d 204, 209 (1978) (citation and emphasis omitted).

¶ 35        In considering circumstantial evidence, a jury may properly make inferences on inferences in determining the facts constituting the elements of the crime. *State v. Childress*, 321 N.C. 226, 232, 362 S.E.2d 263, 267 (1987). Making inferences which naturally arise from a fact proven by circumstantial evidence "is the way people often reason in everyday life." *Id.*

¶ 36        When ruling on a motion to dismiss, the only question for the trial court is whether "the evidence is sufficient to get the case to the jury; it should not be concerned with the weight of the evidence." *State v. Earnhardt*, 307 N.C. 62, 67, 296 S.E.2d 649, 652 (1982) (citing *State v. McNeil*, 280 N.C. 159, 162, 185 S.E.2d 156, 157 (1971)). If the evidence is sufficient only to raise a suspicion or conjecture as to either the commission of the offense or the identity of the defendant as the perpetrator, the motion to dismiss must be allowed. *State v. Malloy*, 309 N.C. 176, 179, 305 S.E.2d 718, 720 (1983) (citing *State v. Poole,* 285 N.C. 108, 203 S.E.2d 786 (1974)).

¶ 37         The majority accurately summarizes the evidence presented in this case, but I disagree with the majority's resulting analysis. In summarizing the evidence, the majority appears to engage in a determination of whether the facts, taken singly or in combination, were satisfactory beyond a reasonable doubt that defendant is actually guilty. With respect to defendant's motion to dismiss for insufficient evidence, the only question we must answer is whether there was evidence that gives rise to a reasonable inference of guilt.

¶ 38         The State presented evidence that the victim carried large amounts of cash on his person, he was due to bring money to his daughter on the morning he was found dead, and that a police search of his residence immediately after his murder revealed no cash or billfold. The State also presented evidence that defendant was a long-term crack cocaine user that frequently borrowed small amounts of cash from friends, his employer, and others, including the victim, and was in possession of nearly $3,000 in cash immediately after the victim's murder. Regarding this money, the State presented evidence that the cash was hidden in a glove, inside a McDonald's bag, inside his girlfriend's mother's outdoor trashcan, across the street from where defendant was staying, and that defendant had not been in possession of that money on several occasions prior to the victim's murder. Finally, the State presented evidence from defendant's cell phone records that defendant was in the vicinity of the victim's residence and another acquaintance's residence on the night he told police he

had stayed at home, and that defendant had deleted all call and text histories apart from very recent calls and a text message from the morning the victim's body was discovered.

¶ 39 In this case, I would hold that the evidence of defendant's location, his possession of a large amount of cash, his history with the victim, and defendant's apparent concealment of evidence was sufficient to raise a reasonable inference that defendant was guilty of armed robbery and first-degree murder. Accordingly, I believe the case was properly submitted to the jury.

## II. Motion for a Mistrial

¶ 40 "We review the trial court's denial of [d]efendant's motion for a mistrial for abuse of discretion." *State v. Sistler*, 218 N.C. App. 60, 70, 720 S.E.2d 809, 816 (2012). "Abuse of discretion results where the court's ruling is manifestly unsupported by reason or is so arbitrary that it could not have been the result of a reasoned decision." *State v. Hennis,* 323 N.C. 279, 285, 372 S.E.2d 523, 527 (1988). "In our review, we consider not whether we might disagree with the trial court, but whether the trial court's actions are fairly supported by the record." *State v. Lasiter,* 361 N.C. 299, 302, 643 S.E.2d 909, 911 (2007).

¶ 41 "Where, immediately upon a defendant's objection to an improper remark made by the prosecutor in his closing argument, the trial court instructs the jury to disregard the offending statement, the impropriety is cured." *State v. Woods*, 307

N.C. 213, 222, 297 S.E.2d 574, 579 (1982). However, if a defendant fails to object to a prosecutor's closing argument at trial, this Court "must consider whether the argument was so grossly improper that the trial court erred by failing to intervene *ex mero motu*." *State v. Rogers*, 355 N.C. 420, 452, 562 S.E.2d 859, 879 (2002). The defendant's failure to meet the State's evidence is properly the subject of a prosecutor's closing argument. *Id.*

¶ 42    In this case, the State's closing argument addressed facts supported by competent evidence and suggested inferences based on those facts. The State argued, without objection, that "every time they went to check on something that the defendant had told them, it was a lie," and that none of defendant's accounts to police were verified. The State continued as follows:

> You need a reasonable explanation for that money. If you don't have a reasonable explanation for where that money came from –
>
> MR. HOFFMAN: Your Honor, I'm going to object.
>
> THE COURT: Hold on one second. Approach.
>
> (Counsel approached the bench.)
>
> THE COURT: Sustained.
>
> [STATE]: If you can't in your own mind, reasonably resolve where that money came from, he's guilty, period. In his world, there was no other place it could have come from.

STATE V. DOVER

2021-NCCOA-405

*ARROWOOD, J., dissenting.*

Although defendant objected to the State's original phrasing, defendant failed to object to the following statement and now argues that the trial court should have issued a curative instruction, rather than simply sustaining the objection. Defendant additionally cites several cases to support the proposition that a jury charge cannot cure an error in closing argument and that a curative instruction must be prompt or immediate. I find this case distinguishable from those cited by defendant, as defendant did not object to the rephrased argument. Defendant has failed to show that the State's closing argument was so grossly improper that the trial court had a duty to intervene *ex mero motu*. Accordingly, I would hold that the trial court properly denied defendant's motion for a mistrial.