IN THE SUPREME COURT OF NORTH CAROLINA

2022-NCSC-76

No. 298A21

Filed 17 June 2022

STATE OF NORTH CAROLINA

v.

DAVID MYRON DOVER

Appeal pursuant to N.C.G.S. § 7A-30(2) from the decision of a divided panel of the Court of Appeals, 278 N.C. App. 723, 2021-NCCOA-405, reversing the trial court's denial of defendant's motion to dismiss and vacating a judgment entered on 19 September 2019 by Judge Richard S. Gottlieb in Superior Court, Rowan County. Heard in the Supreme Court on 9 May 2022.

*Joshua H. Stein, Attorney General, by Benjamin Szany, Assistant Attorney General, for the State-appellant.*

*Marilyn G. Ozer for defendant-appellee.*

NEWBY, Chief Justice.

¶ 1     This case requires us to determine whether the trial court properly denied defendant's motion to dismiss the charges of robbery with a dangerous weapon and first-degree murder. When considering a motion to dismiss, the trial court must determine whether there is substantial evidence of each element of the offense and whether the defendant was the perpetrator of the offense. If substantial evidence supports a reasonable inference of each element and that the defendant committed

the crime, then the motion to dismiss should be denied. Here substantial evidence supports the reasonable inference that defendant murdered the victim and took $3,000. Accordingly, the trial court properly denied defendant's motion to dismiss. We reverse the Court of Appeals' decision and remand to the Court of Appeals for consideration of defendant's remaining argument.

¶ 2      In considering a defendant's motion to dismiss, we look at the facts in the light most favorable to the State. At the time of his "sudden, unexpected, and violent death," Arthur "Buddy" Davis was seventy-nine years old. Though he "had a few health problems," Mr. Davis was generally in good health for his age. He was "[w]onderful, kind, generous, soft-spoken, [and] very considerate." Every morning, Mr. Davis spoke with his two adult daughters. Every night before bed, Mr. Davis would call each of his daughters and sing them "a good-night song." He lived in a single-wide trailer at 2000 Chris Ann Lane in Kannapolis. One of his daughters, Charlotte, lived in a trailer "right beside" him with her husband, Waylon Barber (Barber). Mr. Davis had worked selling "cars all his life . . . since before [his daughters] w[ere] born." Mr. Davis first met Terry Bunn (Terry), the owner of Terry's Auto Sales in Kannapolis, at a car auction well before the events in this case. After Terry opened the business, Mr. Davis began working at Terry's Auto Sales as a salesman.

¶ 3      At Terry's Auto Sales, Mr. Davis did "a whole lot of things that w[ere] done

around the office. He took care of answering . . . the phones. When [Terry] wasn't there . . . [Mr. Davis] was the one in charge. . . . [W]hatever the office needed is what [Mr. Davis] did." Mr. Davis often "went with [Terry] to the [car] sales," where they "picked out what [cars they] wanted" to buy to be resold at Terry's Auto Sales. If Terry found a car at the auction that he wanted to buy but did not have the money, then Mr. Davis would loan Terry the money to purchase the car and Terry would pay him back with interest. When Mr. Davis "would go to these sales and . . . purchase a car," "he carried a lot of cash on him." Mr. Davis would carry the cash "folded over and usually in his front pocket," and "[h]e had places in his billfold that he had money" as well. One time when Terry borrowed money from Mr. Davis to buy a motorcycle, Mr. Davis "pulled money out of every corner of his billfold."

At the time, defendant was the only employee at Terry's Auto Sales other than Mr. Davis. Defendant started working for Terry's Auto Sales as a mechanic in the fall of 2015. He repaired cars in the garage attached to the office, typically earning $300 or $400 per week. In December of 2015, defendant was placed on probation. At that time, defendant lived in a motel. Eventually, he moved in with his girlfriend, Carol Carlson, who was also on probation and lived at 130 Haven Trail in China Grove across the street from her mother. Though defendant was "a good employee[ and] a very good mechanic," defendant had substance abuse issues that began to worsen.

While defendant was on probation, he tested positive twice for illegal

substances, resulting in his probation officer referring him to a substance abuse and mental health treatment center. Terry, who had known defendant for almost twenty years and worked with him previously, noticed that defendant lost a significant amount of weight and his attitude shifted. A waitress at Lane Street Grill, the restaurant that defendant, Mr. Davis, and Terry visited for breakfast "about every day, five days a week," also noticed that defendant "looked like he was wired up a lot more," that "[h]is personality changed a little bit," and that "deep down he just wasn't the same." After the waitress asked defendant to repay twenty dollars he owed her, defendant stopped coming to the restaurant and never repaid the money. Eventually, Mr. Davis repaid the waitress on defendant's behalf. Moreover, by February of 2016, defendant owed more than $2,000 in court costs and probation supervision fees.

¶ 6         Defendant also borrowed money from Terry, "[s]ometimes . . . every afternoon . . . especially later on." Eventually, defendant was "borrow[ing] more money than he had coming to him," but Terry still let him borrow money. A few weeks before Mr. Davis's death, Terry caught defendant returning parts that belonged to the company and keeping the money without permission. Terry almost fired defendant, but Mr. Davis "talked [Terry] out of it" because the shop "needed a mechanic." Defendant also borrowed money from Mr. Davis, which "was pretty much a regular thing, too, that [defendant] would ask, and . . . almost every time [Mr. Davis] . . . did let him borrow the money." A few days before his death, Mr. Davis "had just gotten mad about"

defendant borrowing money and refused to loan more money to defendant. According to defendant, even though Mr. Davis sometimes stopped loaning him money, Mr. Davis would eventually still give defendant more money.

¶ 7      In late April of 2016, a customer named Murphy Sauls (Sauls) asked defendant to repair the transmission in his Oldsmobile Cutlass. Defendant agreed to repair the car for $700. Sauls's friend paid defendant $400 on 22 April 2016 as a partial payment for the work. Defendant replaced the transmission in Sauls's Oldsmobile with a transmission from an Oldsmobile which belonged to Terry's Auto Sales. After working on the car for a few weeks, defendant called Sauls on Saturday, 7 May 2016 and "said [the] car was ready." Defendant then "picked [Sauls] up at home, took [him] to the bank, [and Sauls] withdrew [$]300 and gave it to [defendant]," fully paying for the repair. Then, on Sunday, 8 May 2016, defendant borrowed twenty dollars from Mr. Davis again, even though Mr. Davis had recently refused to loan defendant more money.

¶ 8      The next day, Monday, 9 May 2016, Mr. Davis brought out his chainsaw around 4:00 p.m. to help his son-in-law, Barber, cut a tree limb that had fallen during a storm. Meanwhile, that evening defendant borrowed another "[$]30 or $40 from [Terry] . . . and told [Terry] that he was going to collect on that transmission job that night," despite having already collected that money from Sauls just two days earlier. Thus, defendant "told [Terry] he would have $300 for [Terry] the next morning."

Defendant was also three months behind on his power bill, and his electric service was going to be terminated the next day. After speaking with Terry, defendant continued his mechanic work at the dealership. That evening, while Barber was working on his wife Charlotte's Jeep by himself, defendant "rode by a couple times." The last time, around 9:00 p.m. after it was dark, defendant stopped and "asked [Barber] what was wrong with the Jeep." When Barber went back inside around 9:35 p.m., Charlotte was talking to Mr. Davis on the phone as she did every night. Mr. Davis called his daughter April as well and "sang [her] a song good night." Mr. Davis "was supposed to come over [to April's home] at 7:00 [a.m.] the next morning" to give April money.

¶ 9 Records of the calls defendant made from his cell phone showed that between 9:46 p.m. and 10:23 p.m., defendant made several phone calls from the area of his home at 130 Haven Trail in China Grove. Then, between 11:22 p.m. and 11:32 p.m., defendant made several more phone calls from the area that included Mr. Davis's residence and Terry's Auto Sales. Two of defendant's calls during this time, at 11:31 p.m. and 11:32 p.m., were to Mr. Davis's phone. Defendant concealed his phone number when he made these two calls. Defendant later told investigators he "called [Mr. Davis] two or three times" that night, but Mr. Davis never picked up. Defendant wanted to borrow twenty dollars from Mr. Davis.

¶ 10 Later that evening, between 10:00 p.m. and 12:00 a.m., defendant went to the

home of Walter Holtzclaw (Holtzclaw), a known drug dealer, at 3052 Clermont Avenue to buy drugs. Defendant's phone records showed he made calls from the area of Holtzclaw's home at 12:11 a.m. and 12:12 a.m. During this visit, defendant paid twenty dollars for "[a] dime of crack" and "was looking for a woman." Defendant was dressed "[i]n mechanic clothes" and was "very filthy, oily and greasy, like somebody maybe pulled him out of a grease pit." Holtzclaw told defendant he would not "give [defendant a woman] the way he was looking." Defendant left and eventually returned to his home, making several phone calls from the area of his home between 12:49 a.m. and 1:30 a.m. Defendant then came back to Holtzclaw's home around 2:00 a.m., and "got 40 or 50 [dollars] worth" of drugs. Defendant "had cleaned up and everything" and was wearing casual clothes, with no blood or other stains and had a "whole handful of bills" in his hand. After leaving, defendant returned to Holtzclaw's house a third time around 6:00 a.m. with his girlfriend, Carol, and bought another twenty dollars of drugs.

¶ 11     Mr. Davis's daughter, April, became concerned when he was not at her house at 7:00 a.m. that morning, and she started calling him repeatedly. Mr. Davis did not answer the phone. After about an hour passed, April called Terry's Auto Sales to check if Mr. Davis was at the car lot. Defendant answered the phone, and April, recognizing defendant's voice, had the following exchange with defendant about her father:

> [April:]   I said—I answered the phone. I said, ["]Can I speak to [Mr. Davis]?["]
>
> The man said, ["]Who the hell is this?["]
>
> I said—I said, ["]This is April, his daughter. That's who the hell I am.["]
>
> And then he goes, ["]Well, he isn't F-ing here anymore.["]
>
> And then I said, ["]What do you mean he isn't here?["] And then hung up the phone—he hung up the phone.

April then called her sister, Charlotte, who was already on her way to April's house and had not heard from their father either. Concerned, Charlotte then called her husband, Barber, and asked him to go check on Mr. Davis. By the time Barber arrived at Mr. Davis's trailer, Terry Bunn had already found Mr. Davis and called 911.

When Mr. Davis had not come to work that morning, Terry grew concerned that perhaps Mr. Davis "was sick or, you know, was having some problems, so [Terry] went to [Mr. Davis's] house" to check on him. When Terry arrived at Mr. Davis's house, the door to Mr. Davis's trailer was locked, and there were no signs of forced entry. Mr. Davis did not answer, so Terry picked up "a flat screwdriver, and [he] slid it in behind the door . . . [and] just jimmied the door open." There were "obvious signs of some type of struggle in the living room, some stuff knocked off of shelves, knocked over, pushed—furniture pushed at a different angle where you can tell that it wasn't put there on purpose." Blood droplets led from the living room to the kitchen, where

"a lot of blood" had puddled on the linoleum floor and spattered around the kitchen, with some landing on an organ nearby. Looking around, Terry then saw Mr. Davis's "feet sticking out of . . . the bedroom." "[I]t looked like Mr. Davis, after he had been attacked, had tried to get to the back bedroom to get to a phone to call for some help."

¶ 13      Mr. Davis's body was "leaning more towards his right side on the floor" and was "propped against the side of the bed." Mr. Davis had "[fourteen] stab wounds on his chest, abdomen, and back." One stab wound on Mr. Davis's back "went through the muscles between two of the ribs along the spine, but not into the spine, and hit the heart." Another stab wound injured Mr. Davis's "right lung with some bleeding into the chest cavity." Several more stab wounds on Mr. Davis's lower chest and the right side of his body injured Mr. Davis's diaphragm and liver. Mr. Davis also had shallow cuts on several parts of his body, including his lips, both sides of his neck, his left hand, his left armpit and his right forearm. Mr. Davis's cause of death was "listed as multiple sharp force injuries" due to the stab wounds that injured several major organs. None of the stab wounds "hit any of the major blood vessels . . . so blood was [not] going to go spurting out or anything like that, but it is going to bleed." When Mr. Davis was unresponsive, Terry called 911 and then saw Barber come in the trailer. Law enforcement arrived shortly thereafter.

¶ 14      That same day, after talking with Terry and Mr. Davis's relatives and canvassing the neighborhood for any witnesses, investigators with the Kannapolis

Police Department wanted to speak with defendant "because he actually worked with the deceased. . . . [They] had already talked to Terry Bunn, so [they] wanted to talk to the next person that worked with [Mr. Davis]." Investigators were looking for "drug users who knew [that Mr. Davis] had money." Defendant's probation officer informed investigators that defendant was at Rowan Helping Ministries, the local homeless shelter that also assists people with utility bills. Defendant was seeking help because he "was three months behind on the power bill" and "[t]hey w[ere] going to cut [the] power off." In a later interview with a detective, defendant said, "That . . . hurts. I'm [fifty-three] years old, and I've got to ask somebody to pay my power bill."

After defendant left Rowan Helping Ministries, officers at defendant's house then saw him "pull in, driving. They knew that he was . . . driving while [his] license [was] revoked." A warrant for defendant's arrest was obtained based on defendant's driving while his license was revoked, but service of that warrant "was held off." During the evening of 10 May 2016, Detective Lemar Harper with the Kannapolis Police Department "drove over to [defendant's] residence" to speak with defendant. Defendant knew of Mr. Davis's death, but his girlfriend Carol "was shocked because she didn't know that [Mr. Davis] had died. [Defendant] never told her," which Detective Harper thought was odd. After Detective Harper spent approximately twenty minutes at defendant's residence, defendant voluntarily agreed to go to the police station and speak with Detective Harper about the investigation. As they left,

Detective Harper watched as defendant "reached into his pocket, [and] gave his girlfriend $20 from his pocket. It appeared he had about $50 on him at the time. . . . [Detective Harper] thought it was odd at the time because [they] knew already that [defendant] was struggling with money, always asking to [borrow] money."

¶ 16     Detective Harper interviewed defendant at the police station beginning around 9:30 p.m. on 10 May 2016. Defendant told Detective Harper that he "got home around between 8:00 [p.m.] and 9:00 [p.m.] . . . [and] stayed home the rest of the night." Defendant claimed that after he "stopped and talked to [Barber]" around dusk, "he went back to the car lot, checked the fluids" of the car he was test-driving, then made one other stop and went home. Defendant also told Detective Harper that he "tried to call [Mr. Davis] yesterday after [defendant] got home," which was "probably right around 10 o'clock." Defendant "wanted to borrow $20" from Mr. Davis. When Detective Harper asked defendant about the money defendant had given to Carol earlier, defendant took money from his pocket and showed Detective Harper thirty-one dollars. Detective Harper "want[ed] to know about where [defendant] got [the] money."

¶ 17     Defendant tried to explain that the money came from Sauls for the work on the transmission in his Oldsmobile, but defendant emphasized that "[i]t's Terry's money" because defendant still had to repay the money Terry previously loaned him. Defendant claimed that Sauls paid him "about $400" that morning and that "Terry

was expecting money that day from him," but defendant "kept changing" the amount. Defendant also claimed that, while it was daylight on 9 May 2016, "[h]e went and got [a] dime of crack cocaine and brought it back to Terry's car lot . . . and smoked it there." Detective Harper said he "wanted to corroborate [defendant's] story and wanted to look at [defendant's] cell phone in order to try to do that." Defendant responded, "I don't give a damn . . . I don't care, I don't care" and gave Detective Harper his phone. Information from defendant's phone could not be retrieved using the police department's "mobile forensic device" due to the age of defendant's phone. Instead, investigators manually searched the call log and text message history. Detective Harper "noticed that there weren't any calls in the call history besides after we picked up [defendant] for him to come to the police department." Other than "one text message in there from 10 o'clock from Carol," the text messages were also gone.

¶ 18 Later that night around 11:00 p.m., defendant "went out to the parking lot" after the interview ended. While defendant was "waiting for [officers] to give him a ride back home," defendant "got arrested for that . . . driving while license revoked" charge. Defendant declined to be interviewed a second time. The next morning, while defendant was in custody, he called his girlfriend, Carol, on a recorded line to which investigators were listening. Defendant first asked Carol where she was, and Carol said that she was at home. Defendant and Carol then discussed as follows:

Carol: They want a thousand dollars.

Defendant: Well, look . . . don't take the trash out. Listen to me . . . has the—

Carol: Okay.

Defendant: —has the police been back there?

Carol: No.

Defendant: Hey, can you get a bondsman to come and get me?

Carol: I guess, but I don't got money.

Defendant: I'm fixing to tell you where some's at.

Carol: Okay.

. . . .

Defendant: Listen to me, go out there—

Carol: Okay.

Defendant: —in the trashcan, the . . . trashcan.

Carol: The big one?

Defendant: The one at the damn steps. Got it?

Carol: Okay.

Defendant: Alright.

Carol: Yeah.

Defendant: In the big black bag that's in the bottom—

Carol: Okay.

Defendant: —they's a McDonald's bag in there inside that McDonald's bag they's a glove . . . .

. . . .

> Defendant: Look, in that McDonald's bag there's three thousand dollars in a glove, okay?

Carol then searched through the trashcan for the money. Defendant said the money was "rolled up real tight and round." Carol found the money and stated, "I got it." Then defendant said, "Come and get me immediately," to which Carol responded, "I'm coming to get you right now . . . I'm gonna have Lucky come bring me."

After hearing defendant's phone call to Carol, officers "immediately went out there to try to intercept Carol and the money." Two officers went to the jail "to see if [they] could catch up to [Carol]." When they arrived, Carol was inside and agreed to voluntarily speak to the officers. Carol was "[e]xtremely jittery" and "talkative, talkative, talkative." When asked about the money, Carol admitted that she had it and told the officers she paid $1,000 to the bail bondsman and that the remainder of the money was in her purse. The officers then retrieved $1,724 from her purse. The money paid to the bail bondsman was also retrieved.

Meanwhile, Detective Harper and another officer searched the trashcan outside the home of Carol's mother and "found the rolled up, empty McDonald's bag, except that there was a glove inside that was empty." When further investigation into defendant's phone records revealed he had not stayed at home as he told Detective Harper, officers arrested him for first-degree murder and robbery with a dangerous weapon on 12 May 2016. On 16 May 2016, a grand jury returned true bills of

indictment against defendant for first-degree murder and robbery with a dangerous weapon.

¶ 21     Defendant's trial began on 9 September 2019. Defendant moved to dismiss the charges at the close of the State's evidence and renewed the motion to dismiss at the close of all the evidence, arguing that the evidence was insufficient to prove defendant was guilty of both first-degree murder and robbery with a dangerous weapon. Defendant contended that "there is no direct tie between that particular money and . . . where it came from. . . . There was . . . nothing to trace it back to being specifically Mr. Davis's money." Further, defendant argued that "it's completely circumstantial at that point that there's an actual link with that much money." The trial court denied the motions to dismiss. The trial court also denied defendant's motion for a mistrial, which was based on statements the State made as part of its closing argument. On 19 September 2019, the jury found defendant guilty of robbery with a dangerous weapon and first-degree murder based on "malice, premeditation, and deliberation" and "on the basis of [the] first[-]degree felony murder rule on the basis of robbery with a dangerous weapon." The trial court sentenced defendant to life imprisonment without parole on the first-degree murder charge and arrested judgment on the robbery with a dangerous weapon charge. Defendant appealed to the Court of Appeals.

¶ 22     At the Court of Appeals, defendant argued the trial court erred by denying his

motion to dismiss. *State v. Dover*, 278 N.C. App. 723, 2021-NCCOA-405, ¶ 19. Specifically, defendant argued that " '[t]he State failed to present any evidence that [Defendant] entered the trailer of [Mr. Davis] and committed murder' and '[t]he State failed to present any evidence connecting [the $3,000.00 in cash] with [the victim].' " *Id.* ¶ 23 (alterations in original). Defendant also argued that the trial court should have granted his motion for a mistrial because portions of the State's closing argument were improper. *Id.* ¶ 30. A divided panel of the Court of Appeals agreed with defendant that the trial court erred by denying his motion to dismiss. *Id.* ¶ 22.

¶ 23        In its analysis, the Court of Appeals first recounted "[t]he evidence favorable to the State," which established that

> [d]efendant lied to the police and changed his story as to his whereabouts on the night of the murder; cell tower records placed [d]efendant in the same vicinity as Mr. Davis's mobile home on the night of the murder; [d]efendant deleted his cellphone call and text messaging history; there was no forced entry in Mr. Davis's mobile home, suggesting he knew the perpetrator; the fact that [d]efendant was in possession of $3,000.00 in cash with no explanation of where it came from; Mr. Davis's wallet and any cash he may have had were missing from his mobile home; [Terry]'s testimony that Mr. Davis usually "carried a lot of cash on him" and kept cash in his wallet; Mr. Davis planned to meet his daughter the morning after the murder to bring her money; [d]efendant's continued asking to borrow money from Mr. Davis; and Mr. Davis told [d]efendant a few days before his death he refused to loan [d]efendant any more money.

*Id.* ¶ 24 (footnote omitted). The Court of Appeals initially agreed with the State that

"the jury could reasonably infer Mr. Davis had cash in his mobile home" because the evidence showed Mr. Davis planned to meet his daughter the next morning to give her money. *Id*. ¶ 25. Moreover, the Court of Appeals conceded that defendant "was in the general vicinity of the deceased's home at the time of the murder and that he made several arguably contradictory statements during the course of the police investigation." *Id.* ¶ 28 (quoting *State v. White*, 293 N.C. 91, 97, 235 S.E.2d 55, 59 (1977)).

The Court of Appeals thus conceded that the State had proven that "[d]efendant had an opportunity to commit the crime charged," *id*. ¶ 28 (quoting *White*, 293 N.C. at 97, 235 S.E.2d at 59), but also noted that "crucial gaps existed in the State's evidence," *id*. ¶ 27. Specifically, "[t]he State failed to link [d]efendant to the stolen cash" and failed to prove that the stolen money originated from Mr. Davis's mobile home. *Id*. Thus, the Court of Appeals held that "the [r]ecord is insufficient to show more than a suspicion that [d]efendant murdered Mr. Davis and robbed him with a dangerous weapon." *Id*. ¶ 29. Accordingly, the Court of Appeals reversed the trial court's denial of defendant's motion to dismiss and vacated defendant's convictions. *Id*. ¶ 31. Because the Court of Appeals held that the charges against defendant should have been dismissed, it did not address defendant's argument that the trial court erred by denying his motion for a mistrial. *Id*. ¶ 30.

The dissent contended that the trial court did not err by denying defendant's

motion to dismiss. *Id.* ¶ 32 (Arrowood, J., dissenting). The dissent emphasized that "the evidence 'need only give rise to a reasonable inference of guilt,' " *id.* ¶ 34 (quoting *State v. Turnage*, 362 N.C. 491, 494, 666 S.E.2d 753, 755 (2008)), which is true "regardless of whether the evidence is direct or circumstantial," *id.* Moreover, the dissent noted that when "considering circumstantial evidence, a jury may properly make inferences on inferences in determining the facts constituting the elements of the crime." *Id.* ¶ 35. The dissent argued "that the evidence of defendant's location, his possession of a large amount of cash, his history with the victim, and defendant's apparent concealment of evidence was sufficient to raise a reasonable inference that defendant was guilty of armed robbery and first-degree murder." *Id.* ¶ 39. Accordingly, the dissent would have affirmed the trial court's denial of defendant's motion to dismiss. *Id.*

¶ 26     Thus, the dissent also addressed defendant's argument regarding the trial court's denial of his motion for a mistrial. *Id.* ¶ 40. The dissent noted that while "defendant objected to the State's original phrasing [of the closing argument], defendant failed to object to the following statement" by the State. *Id.* ¶ 42. Thus, the dissent would have rejected defendant's argument that the trial court was required to issue a curative instruction regarding the State's statement following defendant's original objection. *Id.* Accordingly, the dissent would have held the trial court properly denied defendant's motion for a mistrial. *Id.* The State appealed to this

Court based upon the dissenting opinion at the Court of Appeals.

¶ 27 The State argues that the trial court properly denied defendant's motion to dismiss because the State presented substantial evidence of each element of the offenses of first-degree murder and robbery with a dangerous weapon. Defendant, however, contends that the trial court erred by denying his motion to dismiss. Specifically, defendant argues that the "State failed to present any evidence connecting [the $3,000 of] cash with [Mr. Davis]." Thus, we must determine whether the trial court erred by denying defendant's motion to dismiss.

¶ 28 This Court reviews a trial court's denial of a motion to dismiss de novo. *State v. Blagg*, 377 N.C. 482, 2021-NCSC-66, ¶ 10 (quoting *State v. Golder*, 374 N.C. 238, 250, 839 S.E.2d 782, 790 (2020)). "In ruling on a motion to dismiss, the trial court need determine only whether there is substantial evidence of each essential element of the crime and that the defendant is the perpetrator." *Id.* (quoting *Golder*, 374 N.C. at 249, 839 S.E.2d at 790). Substantial evidence only requires "more than a scintilla of evidence," *State v. Earnhardt*, 307 N.C. 62, 66, 296 S.E.2d 649, 652 (1982), or "the amount necessary to persuade a rational juror to accept a conclusion," *Blagg*, ¶ 10 (quoting *Golder*, 374 N.C. at 249, 839 S.E.2d at 790). "In evaluating the sufficiency of the evidence to support a criminal conviction, the evidence must be considered in the light most favorable to the State; the State is entitled to every reasonable intendment and every reasonable inference to be drawn therefrom." *Id.* (quoting *Golder*, 374 N.C.

at 249–50, 839 S.E.2d at 790). Moreover, "[a]ny contradictions or conflicts in the evidence are resolved in favor of the State, and evidence unfavorable to the State is not considered." *State v. Miller*, 363 N.C. 96, 98, 678 S.E.2d 592, 594 (2009) (citations omitted). "Courts considering a motion to dismiss for insufficiency of the evidence 'should not be concerned with the weight of the evidence.' " *Blagg*, ¶ 11 (quoting *Earnhardt*, 307 N.C. at 67, 296 S.E.2d at 652).

¶ 29 "The test of the sufficiency of the evidence to withstand the motion to dismiss is the same whether the evidence is direct, circumstantial[,] or both." *Earnhardt*, 307 N.C. at 68, 296 S.E.2d at 653. "[C]ircumstantial evidence is proof of a chain of facts and circumstances indicating the guilt or innocence of a defendant." *State v. Adcock*, 310 N.C. 1, 36, 310 S.E.2d 587, 607 (1984) (quoting 1 E. Devitt & C. Blackmar, *Federal Jury Practice and Instructions* § 15.02 (3d ed. 1977)). "There is no logical reason why an inference which naturally arises from a fact proven by circumstantial evidence may not be made." *State v. Childress*, 321 N.C. 226, 232, 362 S.E.2d 263, 267 (1987). Therefore, it is appropriate for a jury to make "inferences on inferences" when determining whether "the facts constitut[e] the elements of the crime." *Id*. Thus, "[c]ircumstantial evidence may withstand a motion to dismiss and support a conviction even when the evidence does not rule out every hypothesis of innocence." *Blagg*, ¶ 11 (alteration in original) (emphasis omitted) (quoting *State v. Stone*, 323 N.C. 447, 452, 373 S.E.2d 430, 433 (1988)).

¶ 30     Our case law also establishes "that false, contradictory or conflicting statements made by an accused concerning the commission of a crime may be considered as a circumstance tending to reflect the mental processes of 'a person possessed of a guilty conscience seeking to divert suspicion and exculpate [himself].' " *State v. Walker*, 332 N.C. 520, 537, 422 S.E.2d 716, 726 (1992) (alteration in original) (quoting *State v. Myers*, 309 N.C. 78, 86, 305 S.E.2d 506, 511 (1983)). Thus, inconsistencies between "statements of [a] defendant and the evidence at trial . . . ha[ve] substantial probative force, tending to show consciousness of guilt." *Id*. at 538, 422 S.E.2d at 726 (internal quotation marks omitted). "Once the court decides that a reasonable inference of defendant's guilt may be drawn from the circumstances, then it is for the jury to decide whether the facts, taken singly or in combination, satisfy it beyond a reasonable doubt that the defendant is actually guilty." *Blagg*, ¶ 12 (quoting *State v. Fritsch*, 351 N.C. 373, 379, 526 S.E.2d 451, 455 (2000)).

¶ 31     Viewing the evidence in the light most favorable to the State, the evidence supports a reasonable inference that defendant took the $3,000 from Mr. Davis. Defendant contends that the money could have belonged to him originally and not to Mr. Davis because defendant "dealt only in cash and received cash payments directly from customers." The possibility of an inference supporting defendant's innocence, however, does not view the evidence in the light most favorable to the State. *See Miller*, 363 N.C. at 99, 678 S.E.2d at 594 ("[S]o long as the evidence supports a

reasonable inference of the defendant's guilt, a motion to dismiss is properly denied even though the evidence also permits a reasonable inference of the defendant's innocence." (internal quotation marks omitted)).

¶ 32        Moreover, the evidence shows defendant lacked legitimate financial resources. Defendant began working for Terry's Auto Sales in the fall of 2015 and only earned $300 to $400 per week from his work. When defendant's probation began in December of 2015, he was living in a motel. By February of 2016, defendant owed more than $2,000 in court costs and probation fees. Defendant consistently borrowed money from other people, including Terry, Mr. Davis, and a waitress at the restaurant they frequented. When defendant could not repay twenty dollars that he borrowed from the waitress, he stopped going to the restaurant and Mr. Davis paid the waitress on defendant's behalf. Leading up to Mr. Davis's death, defendant borrowed money from Terry almost "every afternoon" and was "borrow[ing] more money than [defendant] had coming to him." Defendant was almost fired when Terry caught defendant returning parts that belonged to Terry's Auto Sales and keeping the money without permission. Defendant also regularly borrowed money from Mr. Davis, including just before Mr. Davis was killed.

¶ 33        Defendant admitted that he tried to call Mr. Davis the night Mr. Davis died because he "wanted to borrow $20" from Mr. Davis, even though Mr. Davis "had just gotten mad about" defendant asking to borrow money. Defendant tried to borrow this

money even though that same evening he had borrowed thirty or forty dollars from Terry. The only other money defendant had in the days before the crime was the $300 he received from Sauls as final payment for the repair on 7 May 2016. Defendant knew that final payment was "Terry's money" because the transmission defendant used originated from a car on Terry's lot. On the night of the murder, 9 May 2016, defendant falsely told Terry that "he was going to collect on that transmission job that night" and that after doing so "he would have $300 for [Terry] the next morning," implying that he no longer had the money from Sauls to give Terry but nonetheless would find a way to pay Terry.

¶ 34    When defendant first visited Holtzclaw's house around midnight, he only "had $20, and that's about all he spent." Defendant then returned to Holtzclaw's house around 2:00 a.m. with "a whole handful of bills" and "got 40 or 50 [dollars] worth" of drugs. Defendant returned to Holtzclaw's house a third time around 6:00 a.m. on 10 May 2016 and bought another twenty dollars of drugs. When speaking with Detective Harper the next day, defendant could not recall whether he owed Terry $300 or $400. Defendant also could not explain where he obtained the money he gave his girlfriend, Carol, before leaving his home or the thirty-one dollars on his person during the interview. Defendant tried to explain that Sauls had paid defendant $400 that morning, even though Sauls had actually paid him $300 several days earlier.

¶ 35    Further, on 10 May 2016, defendant went to Rowan Helping Ministries, where

he was asking for help paying his power bill because he "was three months behind" and "[t]hey w[ere] going to cut [his] power off." Defendant told Detective Harper, "[t]hat . . . hurts. I'm 53 years old, and I've got to ask somebody to pay my power bill." During the same interview, defendant also said, "Everybody takes advantage of [Rowan Helping Ministries], but I need it." Thus, defendant himself acknowledged that he did not have lawfully obtained money to pay his power bill or his debt to Terry.

¶ 36        Moreover, defendant knew the exact location of the $3,000 in the trashcan, rolled up inside a glove, which was inside a McDonald's bag. Nonetheless, defendant chose not to use that money to pay his power bill or to repay his debt to Terry. Defendant's decision not to use this money supports the inference that defendant knew the money was stolen. Finally, defendant's lack of financial resources was fueled in part by his drug addiction, which worsened leading up to Mr. Davis's death and was noticed by those around him. Accordingly, substantial evidence supports the inference that the $3,000 did not originally belong to defendant.

¶ 37        Defendant also contends that, assuming the money did not belong to him, the evidence did not establish that Mr. Davis had possession of the $3,000 on 9 May 2016 before it was taken. The evidence, taken in the light most favorable to the State, established that Mr. Davis "carried a lot of cash on him." Mr. Davis carried enough money that when he went to car sales with Terry, Mr. Davis would occasionally loan

Terry the money to purchase a car. Terry testified that Mr. Davis kept cash "folded over and usually in his front pocket" and in his wallet. Terry also testified that he once watched Mr. Davis "pull[ ] money out of every corner of his billfold." Mr. Davis's daughter, Charlotte, testified that she "would go out with [her] daddy shopping. [Her] daddy would take his wallet out. He would have money in it all the time." Charlotte also testified that she saw Mr. Davis "carry money rolled up." Moreover, Charlotte and April testified that Mr. Davis frequently gave people money. The next morning, April was expecting Mr. Davis to come to her home to give her money. Investigators never found Mr. Davis's wallet nor any money in his trailer, indicating it was stolen. When defendant told Carol the location of the money, defendant stated that the money was "rolled up real tight and round," just as Charlotte said Mr. Davis carried it. Accordingly, the evidence was sufficient to raise a reasonable inference that the $3,000 belonged to Mr. Davis the night he was murdered.

¶ 38     The evidence was also sufficient to raise a reasonable inference that defendant went to Mr. Davis's trailer that night. During his voluntary interview with Detective Harper on 10 May 2016 defendant said that he "got home around between 8:00 [p.m.] and 9:00 [p.m.]" and then "stayed home the rest of the night." The evidence, however, showed that defendant did not stay home that night. Defendant's phone records showed that he was in the area of his home in China Grove until at least 10:23 p.m. Around 11:30 p.m., defendant made phone calls from the area of Mr. Davis's residence

and Terry's Auto Sales. Two of these calls were to Mr. Davis's phone. Shortly after midnight, defendant made phone calls from the area near Holtzclaw's home. Holtzclaw also testified that defendant came to his home between 10:00 p.m. and 12:00 a.m. that night, in dirty mechanic's clothes. Defendant bought "[a] dime of crack" for twenty dollars. After defendant left Holtzclaw's home, defendant made several calls from the area of his home in China Grove again. After cleaning up, defendant then returned to Holtzclaw's home around 2:00 a.m. and got forty or fifty dollars of drugs, paying out of a "handful of bills."

¶ 39        Thus, contrary to defendant's statement, the evidence shows that defendant did not stay at home on the night of 9 May 2016 but rather was in the vicinity of Mr. Davis's home and made multiple trips to buy drugs. Moreover, when investigators manually searched defendant's phone, most of the call log and text message history had been deleted. In the light most favorable to the State, defendant's actions demonstrate that he lied to Detective Harper and attempted to conceal the events of the night, both of which are substantial evidence of defendant's guilty conscience.

¶ 40        In addition, when April called Terry's Auto Sales in the early morning of 10 May 2016 to ask about her father, defendant told her that Mr. Davis "isn't F-ing here anymore," indicating that defendant knew Mr. Davis was not returning. This statement occurred before anyone had discovered Mr. Davis's body. Later that day, when Detective Harper spoke with defendant and Carol at their home, defendant

knew Mr. Davis was dead but had not told Carol, which Detective Harper thought was odd. Finally, there were no signs of forced entry at Mr. Davis's trailer, suggesting that Mr. Davis allowed the assailant to enter because he knew the person. Accordingly, substantial evidence supports the reasonable inference that defendant went to Mr. Davis's trailer during the night of 9 May 2016.

Taken together, these facts show that defendant had the motive, opportunity, and means to commit both the robbery with a dangerous weapon and the first-degree murder. Substantial evidence supports the reasonable inference that defendant was the person who went to Mr. Davis's trailer, murdered him, and took $3,000. Accordingly, the trial court did not err by denying defendant's motion to dismiss. The Court of Appeals, therefore, erred by reversing the trial court's denial of defendant's motion to dismiss. Because the Court of Appeals majority did not determine whether the trial court properly denied defendant's motion for a mistrial, we remand this case to the Court of Appeals to address this issue in the first instance. *See Blue v. Bhiro*, 2022-NCSC-45, ¶ 14 (reversing a decision of the Court of Appeals and remanding the case for the Court of Appeals to consider the plaintiff's remaining arguments).

REVERSED AND REMANDED.

Justice HUDSON dissenting.

In my view, the majority has misapplied our standard of review when testing the sufficiency of the evidence to support a conviction based on inference from circumstantial evidence. It is well-established that

> [o]nce the court decides that a reasonable inference of defendant's guilt may be drawn from the circumstances, then it is for the jury to decide whether the facts satisfy the jury beyond a reasonable doubt that the defendant is actually guilty. But if the evidence is sufficient only to raise a suspicion or conjecture as to either the commission of the offense or the identity of the defendant as the perpetrator, the motion to dismiss must be allowed.

*State v. Chekanow*, 370 N.C. 488, 492 (2018) (cleaned up). Here, the evidence presented is entirely circumstantial and substantial evidence of defendant's guilt must be based on reasonable inferences drawn therefrom. Because it appears to me that the majority has conflated "suspicion or conjecture"—even a series of suspicions and conjectures—as to the identity of the perpetrator of the murder and robbery of Mr. Davis with reasonable inferences drawn from the evidence, I must respectfully dissent.

On 10 May 2016, the Kannapolis Police Department was informed that someone had brutally murdered Arthur "Buddy" Davis, age seventy-nine, in his home. Terry, who was Mr. Davis's employer, and Mr. Davis's son-in-law had broken into Mr. Davis's trailer that morning to check in on him, and they uncovered a gruesome scene: the floor and walls were covered in blood, furniture was strewn

about, and Mr. Davis's body lay mutilated by fourteen distinct stab wounds. Police responded robustly—the entire criminal investigations division as well as detectives from other units and senior officers began actively working the case as fast as possible. But without any eyewitnesses, forensic evidence, or video surveillance, the police decided that their suspect was most likely a "drug user[ ] who knew [Mr. Davis] had money." They began canvasing the area and questioning known drug users.

¶ 44     Defendant Dover, an impoverished drug addict who had worked with Mr. Davis, fit this description. Police questioned defendant but did not discover any cuts or marks that would be consistent with a struggle. Defendant claimed that he got home between 8:00 p.m. and 9:00 p.m. that night and stayed home the rest of the night, when the murder took place. Nevertheless, officers arrested defendant on unrelated charges of driving while license revoked and then monitored his jail phone line. When defendant called his girlfriend and asked her to post his bail using money that he had kept hidden, the police moved to intercept the money. In the State's own words, "[t]he problem [is that] in their financial straits and with two crack habits to support, they don't have any money." When cellphone location records indicated that defendant had not stayed home all night, as he had previously told police, he was additionally charged with robbery and murder.

¶ 45     The State argues that defendant must be the perpetrator based upon inferences drawn from the evidence. The evidence that is favorable to the State was

summarized by the Court of Appeals as follows:

> Defendant lied to the police and changed his story as to his whereabouts on the night of the murder; cell tower records placed [d]efendant in the same vicinity as Mr. Davis's mobile home on the night of the murder; [d]efendant deleted his cellphone call and text messaging history; there was no forced entry in Mr. Davis's home, suggesting he knew the perpetrator; the fact that [d]efendant was in possession of $3,000.00 in cash with no explanation of where it came from; Mr. Davis's wallet and any cash he may have had were missing from his mobile home; [Terry]'s testimony that Mr. Davis usually "carried a lot of cash on him" and kept cash in his wallet; Mr. Davis planned to meet his daughter the morning after the murder to bring her money; [d]efendant's continued asking to borrow money from Mr. Davis; and Mr. Davis told [d]efendant a few days before his death he refused to loan [d]efendant any more money.

*State v. Dover*, 278 N.C. App. 723, 2021-NCCOA-405, ¶ 24 (footnote omitted). This evidence, taken in the light most favorable to the State, shows that defendant had a possible motive to commit the offenses of murder and armed robbery, but it at most raises only a suspicion or conjecture that defendant was the perpetrator of the robbery and murder. Contrary to the majority's position, I conclude that this evidence does not permit a reasonable inference that defendant took the $3,000 found in the trashcan from Mr. Davis, that defendant was at the scene of the crime in Mr. Davis's trailer, or that defendant was the person who robbed and murdered Mr. Davis.

¶ 46        First, the majority concludes that the evidence supports the inference that defendant had stolen the $3,000 recovered from the trashcan from Mr. Davis.

Certainly that inference, if reasonably drawn, would support the further inference that defendant was the perpetrator of both the robbery and murder. However, the majority's inference that the money was taken from Mr. Davis is not supported by the evidence. The majority attempts to draw this inference based on the following facts: defendant had previously borrowed money from Mr. Davis and had called Mr. Davis asking to borrow money from him that night; defendant asked for help paying his power bill from Rowan Helping Ministries; defendant knew the exact location of the $3,000 he had hidden; Mr. Davis frequently carried cash in his wallet and lent cash to family and friends; and, when Mr. Davis went to car shows with Terry, he carried large amounts of cash. The majority infers too much from this evidence, in my opinion, because nothing connects the $3,000 to Mr. Davis beyond mere conjecture.

¶ 47    Crucially, none of this evidence connects the $3,000 denominated in $100 bills found inside a glove inside a McDonald's bag in a trashcan across from defendant's residence to Mr. Davis or Mr. Davis's trailer. DNA testing on the glove containing the bills was inconclusive. None of the witnesses called by the State, including Mr. Davis's eldest daughter, his other daughter and son-in-law who lived in the trailer next door, his girlfriend, and his longtime friend and employer, testified that he kept large amounts of cash in his trailer. Accordingly, while Mr. Davis's wallet was stolen, the absence of other cash stored in his trailer does not indicate it is missing when no witness testified that it had been there previously. Even in the light most favorable

to the State, the evidence shows only that while Mr. Davis was known to carry cash and give or lend it to friends and relatives, including his daughter and defendant, this usually was $20 at a time. Ms. Boshuizen, Mr. Davis's girlfriend, testified that when they went out Mr. Davis usually paid in cash, but when asked whether "[i]n [her] experience, . . . he sometimes carr[ied] large amounts of cash," she replied, "[n]ot large amounts, no." Indeed, the only testimony about Mr. Davis carrying large amounts of cash came from Terry, who testified that in the past he and Mr. Davis would go to car sales together and when they did, Mr. Davis would loan Terry money to buy cars and Terry would pay him back with interest. Terry testified they "used to go to" car auctions "when [Mr. Davis] had his own car lot," but no testimony indicated Mr. Davis was planning to go to a car sale around 9 May 2016. Moreover, while April testified that she was expecting to receive money from Mr. Davis the morning following his death, she did not testify to the amount of money she was expecting or whether it was denominated in $100 bills or smaller denominations. Accordingly, there is simply nothing from which to infer that $3,000 in cash was intended for April. Finally, the majority attempts to infer that the money belonged to Mr. Davis because it was "rolled up real tight and round," and according to Charlotte, Mr. Davis would occasionally carry money that way; however, no evidence showed that this common way of organizing a large quantity of bills was unique to Mr. Davis. Taken together, this evidence shows at most that Mr. Davis would give or loan out $20 or $30 at a

time, that he did not usually carry large amounts of cash and tended to do so only in the past when he owned a car lot and went to car sales with Terry, that there was no evidence that he was planning to attend such a sale around the time of his death, and that there was no evidence he kept large amounts of money in $100 denominations on his person or in his trailer at any time. The majority's attempted inferences to the contrary are sheer conjecture.

¶ 48          In contrast, the evidence shows that defendant regularly received cash from Terry, who testified that "[h]e was paid in cash" and "under the table," and directly from his customers, such as Murphy Sauls, who testified he paid $700 directly to defendant, including $400 borrowed from a friend and $300 drawn from an ATM. During his interrogation, defendant said he collected fees from customers, withheld a portion, and gave the rest to Terry. While we must make every reasonable inference in favor of the State, the only reasonable inference from the evidence here shows that it was defendant, and not Mr. Davis, who dealt regularly in $100 increments and large amounts of cash.

¶ 49          The majority further concludes that the money belonged to Mr. Davis and not defendant because of defendant's habit of getting loans in small dollar amounts from Mr. Davis and others and because defendant relied upon financial assistance from a charity to pay his power bill. But even in the light most favorable to the State, those facts show only defendant's poverty, which does not support an inference that the

money belonged to Mr. Davis. As the first of several reasons, it is at least plausible

that defendant, as someone who was paid under the table and engaged in drug deals,

saved the money over time, keeping his savings in cash. Second, while a juror may

reasonably infer that such a large quantity of cash in these circumstances may have

been illegally obtained, that inference does not connect the money in any way to Mr.

Davis. Third, the State's argument that defendant's possession of the $3,000 was

"sudden and unexplained" as evidence permitting an inference of guilt effectively flips

the burden of proof, when it is the State's duty to establish a connection between Mr.

Davis and the $3,000 in defendant's possession.[1] Finally, defendant's knowledge of

the location of the cash to provide his bail does not connect the $3,000 to Mr. Davis

and cannot support the inference that defendant stole the money from Mr. Davis.

¶ 50        The majority next concludes that defendant was at the scene of the crime based

on defendant's contradictory statements to officers and cell tower information putting

defendant's cellphone in the general vicinity of Mr. Davis's trailer that night. First,

---

[1] The State conceded as much at trial when the State made the following argument
on defendant's motion to dismiss inviting the trial court to flip the burden of proof:

> And, frankly, I've thought about it from Your Honor's
> perspective of *flipping it*. Well, if we look at it on the other hand,
> how else would the defendant come by these funds? The lack of
> any reasonable explanation as to where those funds came from,
> other than the one person that there's been testimony [from]
> that was in the defendant's life that others indicated had regular
> access to that much money.

the State emphasizes that defendant initially lied to the police about his location on the night of 9 May 2016. While defendant claimed to be at home all night, he actually visited a drug dealer several times that evening. From this initial false statement, the State argues that it is reasonable to infer that defendant is guilty of murder and robbery. To be sure, the lie does not exculpate defendant. But without more evidence of defendant's actual location, to infer that it is "substantial evidence" he murdered the victim requires taking a flying and speculative leap past the more obvious, reasonable conclusion: he did not initially want to tell police he was using illegal drugs that night. According to State's witness Detective Harper, defendant did eventually explain to police that he visited a drug dealer that night. Cellphone records corroborate this description of events.

¶ 51        Indeed, the State's own expert stated that none of the cellphone location data collected proved defendant was at the victim's home. Because the State could not collect GPS data from defendant's phone using Cellebrite, they relied on cell tower information instead. Unlike GPS, which more precisely indicates where a *device* was located, cell tower information simply reveals which *tower* a cellphone connected to when a call was placed. A cell tower serves thousands of customers at a time and provides service to a wide area. In this case, when defendant used his cellphone to make calls on the night of 9 May 2016, his phone connected to a tower that served the drug dealer's house, Terry's Auto Sales, and Mr. Davis's trailer. In other words,

the State's evidence proves only what defendant admits and a witness confirms: defendant was at the drug dealer's house getting high. Indeed, the State itself concedes defendant visited the drug dealer's house that night. In contrast, there is nothing about the cell tower information that permits the inference that defendant went to both the drug dealer's house and the trailer.

¶ 52        Because inferences from the evidence that the $3,000 was taken from Mr. Davis by defendant and that defendant was at Mr. Davis's trailer amount to nothing but conjecture, the circumstantial evidence presented here cannot be substantial evidence of defendant's guilt. Accordingly, as a final matter, I note that none of the forensic evidence connects defendant to the crime. Despite collecting swabs from the bloody crime scene at Mr. Davis's trailer, including from several objects, stains, and clothing, and from defendant's car and home, the State was unable to draw any connection between defendant and the murder by way of this evidence. Where, as here, the State offers only conjecture and speculation in place of reasonable inferences from the circumstantial evidence, the simultaneous absence of direct evidence means that the case fails to satisfy the legal requirements for sufficiency of the evidence.

¶ 53        Ultimately, the conclusions the majority seeks to draw from the evidence, even in the light most favorable to the State, do not amount to substantial evidence that the $3,000 was taken from Mr. Davis, that defendant was at the scene of the crime, or that defendant was the perpetrator of the robbery and murder of Mr. Davis. While

the majority is correct that "inferences on inferences" can support a conclusion that defendant committed the offenses charged under our caselaw, *State v. Childress*, 321 N.C. 226, 232 (1987), suspicion on suspicion and conjecture on conjecture cannot. *See Chekanow*, 370 N.C. at 492. Finally, arguments predicated on suspicion that invite the trier of fact to seek an explanation from the defendant cannot stand in for evidence and reasonable inferences that satisfy the burden of proof because " '[t]he presumption of innocence attends the accused throughout the trial and has relation to every essential fact that must be established in order to prove his guilt beyond a reasonable doubt.' He is not required to show his innocence; the State must prove his guilt." *State v. Wilkerson*, 164 N.C. 431, 438 (1913) (quoting *Kirby v. United States*, 174 U.S. 47 (1899)). Accordingly, I respectfully dissent.

Justice EARLS joins in this dissenting opinion.